Sue **MERCIER**, Elizabeth J. Ash, Angela Belcaster, Janet Bohn, Julie Chamberlain, Maureen Freedland, David Goode, Betty Hammond, Curt Leitz, Constance R. Long, David W. Long, Myrna D. Peacock, Becky Post, James L. Reynolds, Ellen Dodge Severson, Eric Severson, Leslie Slauenwhit, Herman S. Wiersgalla, Howard Wiersgalla, James E. Wiffler, Robert Wingate, Henyry Zumach and Freedom from Religion Foundation, Inc., Plaintiffs,

v.

**CITY OF LA CROSSE**, Defendant,

and

**Fraternal Order of the Eagles, La Crosse Aerie 1254 Intervening Defendant.**

No. 02–C–376–C.

United States District Court, W.D. Wisconsin.

Feb. 3, 2004.

James A. Friedman, La Follette, Godfrey & Kahn, S.C., Madison, WI, for Bohn, Janet Chamberlain, Julie Ash, Elizabeth J. Freedland, Maureen Belcaster, Angela Freedom from Religion, Inc. Goode, David Hammond, Betty Leitz, Curt Long, Constance R. Long, David W. Mercier, Sue Peacock, Myrna D. Post, Becky Reynolds, James L. Severson, Ellen Dodge Severson, Eric Slauenwhit, Leslie Wiersgalla, Herman S. Wiersgalla, Howard Wiffler, James E. Wingate, Robert Zumach, Henry, Counsel for Plaintiffs.

Patrick J. Houlihan, La Crosse City Attorney, La Crosse, WI, for City of La Crosse.

Michael Dean, Michael D. Dean, LLC, Waukesha, WI, Francis J. Manion, American Center for Law & Justice, New Hope, KY, for Fraternal Order of Eagles, La Crosse Aerie 1254, Counsel for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

This case has a long and somewhat tortuous history. The dispute began in 1985

when Phyllis Grams, a resident of La Crosse, Wisconsin, complained to the La Crosse Common Council about a monument of the Ten Commandments that was displayed in Cameron Park, which is located in downtown La Crosse and owned by defendant City of La Crosse. The president of plaintiff Freedom from Religion Foundation wrote a letter to the council in which she suggested that the monument be removed from the park. When the council denied the request, Grams and the Foundation filed a lawsuit in this court contending that the presence of the monument in a city-owned park was a violation of the establishment clause of the First Amendment. In 1987, I dismissed the action because the plaintiffs had failed to show that they had standing to sue. *Freedom from Religion Foundation, Inc. v. Zielke*, 663 F.Supp. 606 (W.D.Wis.1987), *aff'd*, 845 F.2d 1463 (7th Cir.1988).

In 2001, the Foundation asked the City again to remove the monument from the park. After the City declined offers from the Foundation, from defendant Fraternal Order of the Eagles and from a local Episcopal church to move the monument to another location, the Foundation and 22 residents of the La Crosse area filed a new lawsuit for declaratory and injunctive relief against the City in July 2002. One month later, the City sold the monument and a 20' × 22' parcel of land underneath it to the Order, which had originally donated the monument to the City in 1960s. In October 2002, the Order installed a fence around the parcel and placed signs on each side that indicated the parcel was now privately owned. After both parties had filed motions for summary judgment, the City erected a second fence just outside the boundary of the Order's parcel. The City posted a sign on the fence indicating that it did not own the property and did not endorse the religious speech.

In an opinion and order dated July 14, 2003, I granted plaintiffs' motion for summary judgment. I concluded that each of the plaintiffs had shown that they had incurred a concrete injury because of the monument's presence in the park and, therefore, they had standing to challenge the display. In addition, I concluded that the City had violated the establishment clause, both by maintaining the monument on public property and by attempting to prevent its removal by selling a small piece of the park to the Order. Finally, I concluded that removal of the monument was the only way that the City could effectively eliminate its endorsement of the religious message. *Mercier v. City of La Crosse*, 276 F.Supp.2d 961 (W.D.Wis.2003). On August 5, 2003, I entered judgment in favor of plaintiffs, ordering the City to remove the monument from the park.

On August 11, 2003, the Order filed a motion to intervene and a motion to alter or amend the judgment or, in the alternative, to provide relief from the judgment. With respect to its motion to intervene, the Order argued that, because it was the buyer of the parcel and the monument, it would be a violation of due process to invalidate the sale without giving the Order an opportunity to be heard. In addition, the Order argued that it should be given a chance to show that the plaintiffs lacked standing to sue, that the constitutionality of the monument's presence before the sale was a moot question, that plaintiffs' suit was barred by the doctrine of laches and that the July 14 opinion and order was inconsistent with circuit precedent.

In an opinion and order dated September 24, 2003, 2003 WL 23315790, I concluded that the Order was entitled to be heard before its property interest was destroyed. I granted the Order's motion to intervene, vacated the August 5 judgment and estab-

lished a new scheduling order to allow the parties to conduct additional discovery and file new dispositive motions.

Now before the court is defendant Fraternal Order of the Eagles' motion for summary judgment. It argues that defendant La Crosse has ended any endorsement by selling the monument along with a small portion of the park. The Order's motion will be denied; I adhere to the conclusion reached in the July 14 opinion and order. The sale of the property did not cure the establishment clause violation but only shifted it. Now, instead of directly endorsing the religious speech on the monument by displaying it on city-owned land, the City has demonstrated its endorsement by giving the Order permanent, preferential access to display the religious speech on land that is surrounded by city-owned property. I cannot find any meaningful difference between a city's own display of a religious monument and a city's grant of permission to one (and only one) private group to permanently display the monument in the same location when the monument is still surrounded by city property. *Freedom from Religion Foundation, Inc. v. City of Marshfield,* 203 F.3d 487, 493 (7th Cir.2000), does not compel a contrary result.

Plaintiffs did not file their own motion for summary judgment. (The City did not file its own motion either; instead, it filed a brief in support of the Order's motion for summary judgment). In plaintiffs' response brief, they ask the court to grant summary judgment in their favor on the court's own motion. Plts.' Br., dkt. # 110, at 2. A district court may enter summary judgment in favor of a nonmoving party when there are no material factual issues in dispute so long as the losing party is given notice and opportunity to come forward with its evidence. *Osler Institute,*

*Inc. v. Forde,* 333 F.3d 832, 836 (7th Cir. 2003).

In this case, there would be no purpose served in holding a trial. The facts of record have not changed since the July 14 opinion and order and these facts are undisputed. Although the Order had an opportunity to depose the plaintiffs or conduct other discovery to develop its standing, mootness and laches arguments, it has submitted no additional evidence of its own. Further, the Order appears to have abandoned its arguments related to mootness and laches. It did not raise these issues in its brief in chief and it did not argue in its reply brief that summary judgment should be denied to plaintiffs because it wanted to present these issues at trial. In any event, as I noted in the September 24 opinion and order, the Order's mootness and laches arguments could not succeed. The sale of the monument could moot the issue of the constitutionality of the pre-sale display only if the sale were valid. Because I have concluded that the sale violated the establishment clause, the City still owns the monument and I cannot avoid deciding the constitutionality of the monument's display on public property. Any argument that the doctrine of laches bars plaintiffs' challenge to the sale of the parcel is without merit because the plaintiffs amended their complaint to challenge the sale within a few months after the sale was made.

The only potential factual question raised by the Order is whether plaintiffs have standing. In a footnote in its brief in chief, the Order says that it "assumes" for the purpose of its motion for summary judgment that plaintiffs have standing but "anticipates that it will contest the standing issue in opposing plaintiffs' expected summary judgment motion." Order's Br., dkt. # 107, at 1 n. 1. When plaintiffs did not file a motion for summary judgment,

the Order wrote in its reply brief: "Since plaintiffs have *not* moved for summary judgment, plaintiffs' standing remains an open issue in the event the Court denies the [Order]'s motion. The [Order] need not—and does not—accept at face value that any of plaintiffs have been or are injured by the display in question and believes that plaintiffs' claims would be rejected by a trier of fact." Order's Reply Br., dkt. # 114, at 1 n. 1.

▬ The Order's argument has two problems. First, as a general rule, a court may not "assume" that a party has standing for the purpose of granting a motion for summary judgment on the merits. If a party does not have standing to sue, there is no "case or controversy" under Article III and a court does not have subject matter jurisdiction to hear the case. *Discovery House, Inc. v. Consolidated City of Indianapolis*, 319 F.3d 277, 279 (7th Cir. 2003). Thus, a court has an independent obligation to determine whether standing exists before it considers the merits of a dispute. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines.") (internal quotations and alterations omitted). A court may not skip to the merits even if doing so would result in dismissal of the action. *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 778, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) ("Questions of jurisdiction, of course, should be given priority—since if there is no jurisdiction there is no authority to sit in judgment of anything else."). If I concluded that there was a genuine dispute whether plaintiffs had standing, that issue would have to be resolved at trial before I could consider

whether defendants were entitled to judgment as a matter of law on the merits.

A trial on the issue of standing is unnecessary, however, because the undisputed facts show that each of the plaintiffs has suffered a "concrete harm" that is "actual or imminent" and "fairly traceable" to defendants' conduct. *Stevens*, 529 U.S. at 771, 120 S.Ct. 1858. Although it is plaintiffs' burden to show that they have met the constitutional requirements for standing, I concluded in the July 14 opinion and order that plaintiffs' deposition testimony demonstrated that each of them had altered their behavior or experienced diminished enjoyment of the park because of the monument's presence. This is sufficient to satisfy the Supreme Court's "injury-in-fact" test for standing inquiries. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (affidavits of plaintiffs stating that they do not use river because they fear contamination caused by defendant were sufficient to demonstrate standing to challenge defendant's conduct under Clean Water Act); *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (plaintiffs had standing when they alleged that "aesthetic and recreational" value of park would be lessened because of defendant's conduct); *see also Books v. City of Elkhart*, 235 F.3d 292, 299 (7th Cir.2000) (plaintiffs have standing to challenge Ten Commandments monument if they altered behavior to avoid display).

The Order has submitted no evidence undermining plaintiffs' testimony that they have been harmed by the display of the monument and it does not suggest that it has any. *Jones v. Union Pacific Railroad Co.*, 302 F.3d 735, 740 (7th Cir.2002) (district court's grant of summary judgment on its own motion affirmed when moving party did "not cite to any additional evi-

dence to add to that which he brought forward in his original motion"). Without any evidence to contradict plaintiffs' sworn testimony, I find it undisputed that each plaintiff has suffered an injury sufficient to earn the right to challenge the display and its sale. The Order has not done any more than argue that a jury could disbelieve the other side's witnesses. *Millbrook v. IBP, Inc.,* 280 F.3d 1169, 1181 (7th Cir.2002). It has not come forward with evidence of its own, as it must if it is to show the existence of a genuine issue of fact. *Muhammed v. City of Chicago,* 316 F.3d 680, 683–84 (7th Cir.2002) (party must provide "specific evidence" when attacking witness's credibility).

The dispute in this case is one of law only and has been fully briefed by all of the parties. Thus, granting summary judgment to plaintiffs will not unfairly prejudice defendants. Accordingly, on the court's own motion, I will grant summary judgment in favor of plaintiffs and invalidate the sale. Because the monument cannot be constitutionally displayed in its current setting, defendant La Crosse must remove the monument from the park.

Because the facts have not changed since the July 14 opinion and order, it is unnecessary to set them forth again in this opinion. A reader wishing to review those facts may find them at *Mercier,* 276 F.Supp.2d at 963–68. I pause briefly to clarify three facts from the July 14 opinion and order. First, it appears that the actual size of the parcel sold to the Order was 22′ × 20′ rather than 20′ × 20′ as stated in the July 14 opinion and order. Although the Common Council identified the size of the parcel as 20′ × 20′ in its resolution authorizing the sale, the deed to the parcel states that its size is 22′ × 20′. Aff. of Nikki Elsen, dkt. # 46. Second, the parcel is not literally in the "middle" of the city park as suggested in the earlier opin-

ion; it is nearer to the park's northeast corner. Aff. of Robert Berg, dkt. # 60, Exh. A. However, the city park does surround the parcel on three sides. The fourth side of the parcel borders a public sidewalk. Third, the July 14 opinion and order does not identify the date on which the Common Council passed its resolution authorizing the city attorney to investigate ways that the City could keep the monument in the park. However, the resolution's placement in the undisputed facts section suggests that the resolution was passed between June 2001 and September 2001. The correct date is April 17, 2002. I note these facts for clarity only; they do not suggest a different result.

## OPINION

### A. *Constitutionality of Display before the Sale*

In the July 14 opinion and order, I concluded that defendant La Crosse was violating the establishment clause by displaying a monument of the Ten Commandments in a city-owned park. *Mercier,* 276 F.Supp.2d at 972–74. In coming to this conclusion, I relied partially on *Books v. City of Elkhart,* 235 F.3d 292 (7th Cir. 2000), another case in which the court held that a Ten Commandments display was unconstitutional. Although the Order does not develop any argument challenging this conclusion, it suggests in a footnote that *Books* may be distinguishable because the "two most important factors for the *Books* court—overtly religious oratory at the monument's dedication and proximity to the seat of government—are notably absent in La Crosse." Order's Br., dkt. # 107, at I n. 2. (Although the Order has not shown that it has a legally protected interest in keeping the monument on city-owned property, I will address this argument to avoid any potential unfairness and

because it involves questions of law only, which a court may address on its own.)

I disagree with the Order that the court of appeals found the location of the monument and comments at its dedication to be the "two most important factors" in deciding that the display in *Books* violated the establishment clause. First, it is important to point out that the court considered both whether the primary purpose of the monument was to advance religion *and* whether that was its primary effect. *Books*, 235 F.3d at 302, 304. A failure under either of these tests requires a conclusion that there has been an establishment clause violation. *Id.* at 301. The court considered speech at the monument's dedication only in the context of determining the purpose of the display and it considered the monument's proximity to the city's municipal building only in the context of determining the effect of the display.

With respect to determining the primary purpose of the monument, the court first noted the "religious, indeed sacred, significance" of the Ten Commandments. *Id.* at 302. The court then considered the particular display: "Notably, the prefatory words 'I am the Lord thy God' are set out in large lettering at the top of the text. This religious format is enhanced, not detracted from, by the etchings at the bottom of the tablet of the Stars of David and the Chi Ro symbol, a distinctive Christian symbol." *Id.; see also City of Elkhart v. Books*, 532 U.S. 1058, 1059, 121 S.Ct. 2209, 149 L.Ed.2d 1036 (Stevens, J., statement respecting denial of certiorari) ("The graphic emphasis placed on those first lines is rather hard to square with the proposition that the monument expresses no particular religious preference."). The City did not display the monument as part of a larger historical or otherwise secular display and "the record disclose[d] no sig-

nificant attempt by the City of Elkhart to present the text of the Ten Commandments in a way that might diminish its religious character." *Id.* at 303.

These facts are indistinguishable from those in this case. The monuments in both cases are identical. They are the same size and contain the same text, with the same emphasis on the phrase, "I am the Lord thy God" and the same symbols underneath the text. (The monuments are identical because both were donated by the Order as part of a nationwide practice of giving the displays to municipalities in the 1950s and 1960s.) Just as in *Books*, defendant La Crosse did nothing to diminish the monument's religious character.

It is true that in *Books*, 235 F.3d at 303, the court of appeals discussed speech by religious leaders at the monument's dedication, a factor that is not suggested by the record in this case. However, it would be difficult to argue that comments by private actors would be dispositive in determining the city's purpose; none of the religious statements made at the Elkhart dedication were made by public employees. To the extent that the intent of private actors is relevant, it is undisputed in this case that the Order's purpose in donating the monument was to "preserve the moral and religious heritage of the United States."

In any event, in *Books*, the court did not suggest that there would be no establishment clause violation in the absence of these comments. Rather, the court wrote that the religious purpose of the monument was "further established" by the program of speakers at the dedication of the monument. *Id.* In addition, the court wrote, "Given the obvious religious nature of the text itself, it falls to the City of Elkhart to demonstrate that it has taken steps to obviate its religious purpose." *Id.* at 303 n. 8 (*internal quotations and cita-*

tions omitted). This suggests that a court must infer a religious purpose for a Ten Commandments display unless the government takes proactive measures to show that its purpose was secular.

Whatever doubt *Books* left on this issue is resolved by the court's subsequent decision in *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766 (7th Cir.2001), and the Supreme Court's earlier decision, *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980). *O'Bannon* involved yet another challenge to a public display of a Ten Commandments monument donated by the Order. The court concluded that the monument did not have a secular purpose even though there were no comments in the record that expressed a religious purpose for the display; it repeated *Books*'s holding that because the Ten Commandments are inherently religious in nature, "the state bears the burden of demonstrating that it has taken steps to obviate [the monument's] religious purpose." *O'Bannon*, 259 F.3d at 771.

In *Stone*, the Kentucky legislature had enacted a statute requiring the Ten Commandments to be displayed in public schools. In concluding that the statute had no secular purpose, the Court did not cite any religious statements by individual legislators in enacting the statute. Rather, the Court relied on the "plainly religious" nature of the displays. *Id.* at 41, 101 S.Ct. 192. In addition, the Court noted that the Ten Commandments were not integrated into the school curriculum and did not otherwise serve an educational function. Like the displays in *Stone*, the monument in La Crosse is not part of "an appropriate study of history, civilization, ethics, comparative religion, or the like." *Id.* at 42, 101 S.Ct. 192.

■ *Books, Elkhart* and *Stone* show that "religious oratory" may contribute to a finding that an object does not have a secular purpose, but it is not necessary. A court must evaluate all of the circumstances surrounding the display of a religious object to determine whether it violates the establishment clause. Other courts have held that displaying the Ten Commandments in isolation on public property without taking any steps to obviate their religious message constitutes an establishment clause violation by itself. *E.g., Adland v. Russ*, 307 F.3d 471 (6th Cir.2002); *ACLU Nebraska Foundation v. City of Plattsmouth*, 186 F.Supp.2d 1024, 1034–35 (D.Neb.2002). Further, almost without exception, the only public displays of the Ten Commandments that courts have upheld are those that are included in a larger display with an overall secular message. *See, e.g., Van Orden v. Perry*, 351 F.3d 173 (5th Cir.2003); *Freethought Society of Greater Philadelphia v. Chester County*, 334 F.3d 247 (3d Cir.2003); *Suhre v. Haywood County*, 55 F.Supp.2d 384 (W.D.N.C.1999); *State v. Freedom From Religion Foundation, Inc.*, 898 P.2d 1013 (Colo.1995); *but see Anderson v. Salt Lake City, Corp.*, 475 F.2d 29 (10th Cir.1973) (upholding public display of Ten Commandments by itself), *called into doubt by Summum v. Callaghan*, 130 F.3d 906 (10th Cir.1997). The Court of Appeals for the Seventh Circuit has held that even these displays may violate the establishment clause in some contexts. *O'Bannon*, 259 F.3d at 771 ("the display of secular texts along with the Ten Commandments does not automatically lead to a finding that the purpose in erecting the monument is primarily secular").

■ In its motion for summary judgment, the City attempted to show that the purpose of installing the monument was to commemorate those who participated in efforts to protect La Crosse from a flood that occurred in 1965, the same year that the monument was installed. The Order

repeats the City's assertion in its own summary judgment materials. The Order goes even further, writing, "From the day the ... monument was installed in Cameron Park, La Crosse has tied the display to the commemoration of the 1965 flood volunteers." Order's Br., dkt. #107, at 7.

For the same reasons discussed in the July 14 opinion and order, I cannot accept this articulated purpose as genuine. *Edwards v. Aguillard*, 482 U.S. 578, 586–87, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (courts must determine whether articulated secular purpose is "sincere and not a sham"); *Books*, 235 F.3d at 304 ("[W]e shall not accept a stated purpose that merely seeks to avoid an Establishment Clause violation."). First, defendants have yet to show any rational connection between the Ten Commandments and flood relief efforts or explain why dedicating the monument to the volunteers makes the monument any less religious. It borders on the preposterous to argue that the government can avoid an establishment clause violation by "dedicating" a religious object to a nonreligious group. Adopting such a view would permit municipalities to erect crosses and build churches on public property throughout the city so long as it could think of a new group to which it could dedicate each one.

Even assuming a dedication could show a secular purpose, the record does not support a conclusion that the flood had anything to do with the reasons behind the City's decision to display the monument. The City accepted the monument from the Order before the flood even occurred. *Wallace v. Jaffree*, 472 U.S. 38, 75, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring in judgment) (courts should not rely on "postenactment testimony by particular legislators or by interested persons" in determining whether government had secular purpose). Thus, at most, the dedication was an afterthought. There is no evidence to suggest that the City would have declined to install the monument if the volunteers had not worked as tirelessly as they did. Further, the Order's assertion in its brief that the city "tied" the monument to the flood "from the day the monument was installed" is inaccurate. The monument itself was not displayed with any message acknowledging the volunteers until after the Order purchased the parcel and the monument. It was a member of the Order, not a representative of the City, who stated at the 1965 dedication ceremony that the monument was "dedicated especially to those young people who helped during this spring's flood." The Common Council did not point to the flood relief efforts as a reason for the display until 2002, after the Foundation had filed one lawsuit and was threatening another. Neither the City nor the Order has demonstrated a secular purpose for displaying the monument. Its presence on city property violated the establishment clause.

Even if it were necessary to consider the effect of the public display of the monument, I would disagree with the Order's suggestion that only religious displays near the "seat of government" violate the establishment clause. In *Books*, 235 F.3d at 305, the court did state that "we have subjected to particularly careful scrutiny displays at the seat of government." Certainly, religious symbols near core government buildings are particularly vulnerable to challenge under the establishment clause because such displays are likely to create the appearance that a person's status in the political community is contingent on his or her religious beliefs. *Lynch v. Donnelly*, 465 U.S. 668, 692, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring).

However, neither the Supreme Court nor the court of appeals has suggested that *only* displays near government buildings have an effect of advancing religion. In *Gonzales v. North Township of Lake County,* 4 F.3d 1412 (7th Cir.1993), the court held that a display of a crucifix in a public park violated the establishment clause. In *Freedom From Religion Foundation, Inc. v. City of Marshfield,* 203 F.3d 487 (7th Cir.2000), the court suggested that a religious display by the government on *any* government property could create a perception of endorsement. *Id.* at 491 ("Because it is assumed that a property owner controls expression conducted on its property, we impute the views expressed on a property onto it."); *see also Capitol Square Review & Advisory Board v. Pinette,* 515 U.S. 753, 766, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (plurality opinion) ("Of course, giving sectarian religious speech preferential access to a forum close to the seat of government (*or anywhere else for that matter*) would violate the Establishment Clause.") (emphasis added).

■ Cameron Park is a owned by the City and located in downtown La Crosse. It is an "important civic place" that is the site of a number of public gatherings, including a weekly farmer's market. *City of Plattsmouth,* 186 F.Supp.2d at 1035 (concluding that monument's display in public park had primary effect of advancing religion). The monument's presence in such a location is sufficient to create a perception of endorsement from the standpoint of a reasonable observer.

### B. *Constitutionality of the Sale*

Both defendants focus in their briefs on whether the City has cured any establishment clause violation by selling the monument and a small portion of the park to the Order. In arguing that the current display of the monument is constitutional,

both defendants rely almost entirely on one case, *Freedom from Religion Foundation, Inc. v. City of Marshfield,* 203 F.3d 487, 493 (7th Cir.2000). The Order quickly dismisses as inapplicable each of the Supreme Court cases on which this court relied in the July 14 opinion and order. The Order writes: "[I]t would be manifestly erroneous to rely on cases dealing with (1) government religious speech on government property and in government programs or (2) private religious speech on government property and in government programs." Order's Br., dkt. # 107, at 12. Citing a concurring opinion by Justice O'Connor, the Order argues that this case is distinguishable because it involves only "private speech on private property." *Id.* (citing *Capitol Square Review & Advisory Board v. Pinette,* 515 U.S. 753, 779, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (O'Connor, J., concurring) ("[A]n Establishment Clause violation must be moored in government action of some sort.")). The Order further suggests that removing the monument from the park would be an encroachment on its own First Amendment right of free speech. Order's Br., dkt. # 107, at 13–14.

■ Of course, the Order is correct that there is an important difference between public speech and private speech and that there is no establishment clause violation without state action. *Board of Education of Westside Community Schools v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality opinion). Moreover, I do not question the basic principle that private religious speech is entitled to full protection under the free speech clause of the First Amendment. *Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). However, there *is* government action in this case: the City's sale of property to the

Order. Defendants cannot argue that Supreme Court case law is inapplicable because those cases were "moored in government action" and this one is not. Further, the Order oversimplifies the issue in this case by characterizing it as one involving only "private speech on private property." The question is not whether the government may interfere with a decision by a citizen of La Crosse to erect a religious display on his or her own property. Of course, the answer to this question would be "no." *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 632, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (O'Connor, J., concurring) ("Christians remain free to display their crèches at their homes and churches.") If in the 1950s and 1960s the Order had chosen to display monuments of the Ten Commandments on its own property throughout the country rather than donate them to municipalities, this case would not be in court.

■ However, when, as in this case, the government has controlled *which* private actors are able to speak by controlling access to a forum, the issue is no longer only one of protecting private religious expression. The First Amendment does not grant private actors the right to receive government assistance in expressing their message. *School Dist. of Abington Tp., Pa. v. Schempp*, 374 U.S. 203, 226, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) ("While the Free Exercise Clause clearly prohibits the use of state action to deny the rights of free exercise to anyone, it has never meant that a majority could use the machinery of the State to practice its beliefs.") Thus, the question is not whether the Order has the right to express its religious viewpoint; undoubtedly it does. Rather, the question is whether it is constitutionally permissible for the government to aid in the pronouncement of one religious message by

selling a group a religious monument and a piece of land inside a city park when no other message has been given the same promotion.

It is true that the Supreme Court has not had occasion to consider the precise factual scenario presented in this case. It is also true that the Court has struggled to set forth a consistent framework for addressing questions under the establishment clause, as even the Court itself has recognized. *Lee v. Weisman*, 505 U.S. 577, 619, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (noting that there are "difficult questions" dividing the Court on establishment clause interpretation). That does not mean, however, that more than five decades of establishment clause jurisprudence is irrelevant. Further, although it is not always an easy task to reconcile all of the Court's decisions, one principle has remained clear: the government may not demonstrate a preference for one religion over another. *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687, 696, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) ("A proper respect for both the Free Exercise and the Establishment Clause compels the State to pursue a course of 'neutrality' towards religion, favoring neither one religion over the others nor religious adherents collectively over nonadherents.") (citations and internal quotations omitted); *Lee*, 505 U.S. at 590, 112 S.Ct. 2649 ("[T]he central meaning of the Religion Clauses of the First Amendment ... is that all creeds must be tolerated and none favored."); *Allegheny*, 492 U.S. at 590, 109 S.Ct. 3086 ("at the very least," establishment clause means "that government may not demonstrate a preference for one particular sect or creed"); *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 9, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) (government may not "place its prestige, coercive authority, or resources behind a single religious faith or behind religious

belief in general"); *Wallace v. Jaffree,* 472 U.S. 38, 60, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) ("government must pursue a course of complete neutrality toward religion"); *Larson v. Valente,* 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."); *Gillette v. United States,* 401 U.S. 437, 450, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971) ("[T]he Establishment Clause prohibits government from abandoning secular purposes in order to put an imprimatur on one religion, or on religion as such, or to favor the adherents of any sect or religious organization"); *Schempp,* 374 U.S. at 225, 83 S.Ct. 1560 ("the command of the First Amendment [is] that the Government maintain strict neutrality, neither aiding or opposing religion"); *Torcaso v. Watkins,* 367 U.S. 488, 495, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961) (under establishment clause, government may not "pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs"); *Everson v. Board of Education,* 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (government may not "pass laws which aid one religion, aid all religions, or prefer one religion over another"); *see also Grumet,* 512 U.S. at 715, 114 S.Ct. 2481 (O'Connor, J., concurring) ("[T]he Religion Clauses—the Free Exercise Clause, the Establishment Clause, the Religious Test Clause, Art. VI, cl. 3, and the Equal Protection Clause as applied to religion—all speak with one voice on this point: Absent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits.")

This basic principle alone is enough to decide this case. On its face, the City's sale to the Order violates the establishment clause because it gives preferential treatment to one religious message over all others. Two important related facts compel this conclusion: the small size of the parcel and its location within the park. The 22′ × 20′ parcel sold to the Order is surrounded on three sides by park land still owned by the City; the fourth side borders a public sidewalk. If the City had sold the entire to park to the Order, there would be a stronger argument that the City had "divorce[d] itself from the religious content" of the monument. *Santa Fe Independent School District v. Doe,* 530 U.S. 290, 302, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000). Because the City sold the Order only a tiny portion of the park, that parcel is still "in" the park. Thus, all the sale has accomplished is to provide a permanent venue within the park for one religious viewpoint. In creating this privileged space, the City is "lending its assistance to a church's efforts to gain and keep adherents," which the establishment clause prohibits. *Schempp,* 374 U.S. at 228, 83 S.Ct. 1560 (Douglas, J., concurring) ("But the Establishment Clause is not limited to precluding the State itself from conducting religious exercises. It also forbids the State to employ its facilities or funds in a way that gives any church, or all churches, greater strength in our society than it would have by relying on its members alone.")

To see how the City's sale to the Order demonstrates a preference for a Judeo–Christian viewpoint, one need only consider a slight variation on the facts of this case. Suppose that the city were sponsoring a "free speech" day in Cameron Park. Although all citizens could attend the event, the city would allow only those expressing Christian religious principles to speak. When other members of the community objected to the preferential treatment, the city did not open up the event to

allow other groups to speak or cancel the event all together. Instead, the city sold a platform in the park and the land directly underneath it to a group that it knew would talk about Christian teachings. In an effort to avoid litigation, the city put up a sign disclaiming any endorsement of Christian views.

In this hypothetical, there could be no dispute that the sale would violate the establishment clause. Whether or not it was the city actually doing the speaking, the sale would demonstrate a preference for Christianity because Christians were being granted a benefit that no other group received. *Grumet,* 512 U.S. at 708, 114 S.Ct. 2481 (concluding that statute creating special school district for one religious group violated establishment clause because it benefitted only one group and not "all groups similarly interested in separate schooling"). As in the hypothetical, in this case, the City has neither allowed any other group to express a message in the park (at least permanently) nor established a neutral program to determine which groups may purchase a portion of the land to express their messages. Instead, the Common Council passed a "special and unusual" act, *id.* at 703, 114 S.Ct. 2481, to aid the promotion of one religious message.

Defendants counter that there is no endorsement because the Order paid "fair market value" for the parcel. The plaintiffs dispute defendants' representation of the sale as one for fair market value because property near the park has been sold at a greater rate. In the July 14 opinion and order, I declined to resolve this dispute because it was not dispositive. The price paid for a piece of property is one factor that a court should consider in deciding whether a sale violated the establishment clause. *Annunziato v. New Haven Board of Aldermen,* 555 F.Supp. 427,

433 (D.Conn.1982) (finding that $1 sale of city property to church violated establishment clause). This does not mean however, that all sales made for fair market value pass constitutional muster. If this were the rule, a city could refuse to sell property to anyone but Christians (or Muslims or Wiccans) so long as the city received a fair price for the property. There are many ways the government can promote a religious viewpoint besides giving its adherents free property. Whether the parcel the Order obtained was free or sold for twice its worth, the City has still provided the Order (and no one else) with a benefit that many would argue is much more valuable than free property: the right to use land within the park for the purpose of expressing a religious message.

 Similarly, fences and disclaiming signs cannot cure the establishment clause violation when the problem is not limited to potential confusion regarding the source of the speech. *Compare Pinette,* 515 U.S. at 769, 115 S.Ct. 2440 (plurality opinion) (when all groups have equal access to forum, perception of endorsement sufficiently eliminated by disclaiming sign); *accord id.* at 782, 115 S.Ct. 2440 (O'Connor, J., concurring in part and concurring in judgment); *id.* at 793–94, 115 S.Ct. 2440 (Souter, J., concurring in part and concurring in judgment). "[N]o sign can disclaim an overwhelming message of endorsement." *Allegheny,* 492 U.S. at 619, 109 S.Ct. 3086." No matter how many signs the City posts, its endorsement is still apparent from the privileged space it has provided the private speaker. As I noted in the July 14 opinion and order, to hold otherwise would allow the City to continue selling portions of the park to groups that it knew would use the space for displaying Christian symbols even while it denied the same privilege to those with opposing views, so long as the City put up signs

disavowing its endorsement. The holdings in *Stone, Books,* and *O'Bannon* would be meaningless if the government could avoid the requirements of the establishment clause simply by carving out private spaces on public property for those religious viewpoints it wants to promote. *Pinette,* 515 U.S. at 792, 115 S.Ct. 2440 (Souter, J., concurring) (warning against rule that would allow government to "encourage the private enterprise of the religious to display what the government could not display itself").

In the circumstances of this case, it would be "formalistic in the extreme" to say that a reasonable observer would believe that the signs effectively eliminated the City's endorsement of the religious messages. *Lee,* 505 U.S. at 595, 112 S.Ct. 2649. With or without a disclaiming sign, by giving religious speech privileged access to the park, the City has "sent a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the community." *Lynch v. Donnelly,* 465 U.S. 668, 688, 104 S.Ct. 1355, 79 L.Ed.2d 604 (O'Connor, J., concurring). If anything, the sale of the parcel exacerbates the violation because it communicates to nonadherents that not only is the City willing to display a Judeo–Christian symbol on public property, but it is also willing to carve up a public park to insure that the symbol does not have to be moved or share its space with displays expressing other viewpoints. In this case, the old cliché, "actions speak louder than words," would be an appropriate response to the City's disclaimer.

█ The Order points out that it is not primarily a religious group. Rather, it is "a service organization dedicated to promoting liberty, truth and justice." *Books,* 235 F.3d at 294–95. The Order does not

explain why this fact should control the outcome of the case and I cannot conclude that it does. It is not the nature of the group receiving a benefit that is important for establishment clause purposes, but whether the government's actions show a preference for one religious viewpoint. Even if the Order was an overtly religious group, its purchase of land from the City would not implicate the establishment clause if it had obtained the land under a neutral program. *Southside Fair Housing Committee v. City of New York,* 928 F.2d 1336 (2d Cir.1991) (upholding city's sale of land to religious group because it was part of general urban renewal plan); *Mitchell v. Helms,* 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000). However, as explained above, the City's sale to the Order was anything but neutral. It makes little difference what the Order's general mission is when its sole purpose in buying the land was to preserve a space for the expression of a religious message.

Both defendants emphasize that the Order does not *have* to keep the monument in its current location under the terms of the sale; the Order is free to move the monument to wherever it wishes. As I noted in the July 14 opinion and order, this argument has little persuasive force in the circumstances of this case. Defendants' argument is similar to the one advanced by the school district in *Santa Fe,* 530 U.S. at 315, 120 S.Ct. 2266, which held student elections to determine whether there would be "invocations" at football games. Although the student elected to give the speech was allowed to choose his or her own statement or invocation, the Court held the district could not avoid the requirements of the establishment clause by " 'remain[ing] studiously oblivious to the effects of its actions.' " *Santa Fe,* 530 U.S. at 307 n. 21, 120 S.Ct. 2266 (quoting *Pinette,* 515 U.S. at 777, 115 S.Ct. 2440)

(O'Connor, J., concurring in part and concurring in judgment). In rejecting the district's argument that its policy did not violate the establishment clause because it did not require the student to lead a prayer, the Court wrote: "The District ... asks us to pretend that we do not recognize what every Santa Fe High School student understands clearly—that this policy is about prayer." *Id.* at 315, 120 S.Ct. 2266.

As it was for the school district in *Santa Fe*, it is disingenuous for the City to suggest that it sold the parcel to the Order without reference to the monument or any interest in maintaining its presence in the park. It was the Order that originally requested the monument's placement in the park and that in 2001 sent the City a letter stating, "we believe in the ideas etched in this piece of stone." It was a surprise to no one when the Order chose to keep the monument in its present location. Every La Crosse citizen recognizes that the sale to the Order was about preserving the monument's religious message in the park.

 To the extent that it is necessary to examine the actual intent of the City in selling the parcel to the Order, I adhere to my conclusion in the July 14 opinion and order that the facts show that the City's purpose was to "invit[e] and encourag[e]" a religious message. *Santa Fe*, 530 U.S. at 306, 120 S.Ct. 2266. All of the city's actions leading up to the sale evince an intent to preserve and promote the religious message of the monument. The Common Council declared in its June 2001 resolution that the monument was so important that the City should keep the monument "in its present location by any and all means available to the City." When the Order offered to move the monument to another location, the City rejected the offer and instead, without invitation, offered to sell the Order the "monument site." The City did not respond to the offer of an Episcopal church to display the monument on church property or to the Foundation's offer to purchase the monument.

The Order argues that the City's choice of the Order as the buyer was perfectly reasonable because it was the group that originally donated the monument. Although the City has never identified this as a reason for choosing the Order over the Foundation, I agree that the City would not violate the establishment clause simply because it chose to return the property to its original owner rather than another interested party. However, it is not necessarily the City's choice of buyers that reveals a religious purpose, but its rejection of even the *Order's* offer to move the monument to another location. If the City were not interested in promoting the monument's religious message, why did it insist on keeping the monument in the park despite this offer to move it where there would be no perception of endorsement? The City's failure to consider the offers of the Foundation and the Episcopal church is simply an additional indication that it had no interest in distancing itself from the monument's message.

In the July 14 opinion and order, I found it indicative of the City's intent that none of its "efforts to diminish the perception of endorsement were initiated voluntarily." *Mercier*, 276 F.Supp.2d at 977. Rather, the City consistently refused efforts by plaintiffs and others to move or modify the display, even after a lawsuit was filed. It was not until one month before the original summary judgment deadline in this case that the City erected its own fence and disclaiming signs.

The Order argues that any reliance on the City's past behavior is erroneous. First, the Order says that the City's refusal to cooperate was reasonable because

there was no authority suggesting that its display of the Ten Commandments on public property violated the establishment clause until the court of appeals decided *Books* in 2000. Second, the Order argues that this court adopted a "once-unconstitutional-always-unconstitutional" approach that is inconsistent with circuit precedent. Finally, after making comparisons to George Orwell's *1984* and the Moscow show trials of 1930's, the Order asserts that this court erred in using the City's attempt to mimic *City of Marshfield* as evidence of a religious purpose.

The Order's first argument is misguided for two reasons. First, it is inaccurate to say that there was no authority before 2000 showing that the City's display of the Ten Commandments violated the establishment clause. Even in 1985, when the Foundation brought the first suit, the Supreme Court had already decided *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), which suggested that any display of the Ten Commandments on public property was unconstitutional unless it was part of a larger secular theme. This view was reinforced in *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), in which the Court held that a temporary display by the county of a crèche violated the establishment clause because the crèche "communicated a religious message" and "nothing the context of the display detract[ed] from [its] religious message." *Id.* at 598, 109 S.Ct. 3086.

Even if the City could have not realized that the display was unconstitutional until the court of appeals decided *Books* and *O'Bannon,* the Order overlooks the fact that the Common Council failed to take any action with respect to the monument until April 2002, a year and a half after the court of appeals had decided *Books* and almost one year after the Foundation had asked the City a second time to remove the monument. Even then, the action taken by the Common Council was only to authorize the city attorney to "investigate all necessary resources" to determine a way that the monument could remain in its "present location."

With respect to the Order's second argument, I agree that a government entity that once violated the establishment clause is not forever prohibited from finding other ways of accommodating religion. *Doe v. Small,* 964 F.2d 611 (7th Cir.1992). However, the Order disregards Supreme Court and circuit precedent when it argues that it is improper to evaluate the City's current efforts to maintain the monument in the park in light of its past behavior. In *Santa Fe,* 530 U.S. at 315, 120 S.Ct. 2266, the Supreme Court held that a court's evaluation of government conduct under the establishment clause "not only can, but *must,* include an examination of the circumstances surrounding" the challenged conduct. The Court went on to find that the school district had acted with a religious purpose in enacting a policy for student-led "invocations" at school football games in part because the district had previously enacted policies that more directly endorsed prayer and had changed these policies only in response to litigation. *See also Church of Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 540, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (in determining intent of government, court should consider "the historical background of the decision under challenge" and "the specific series of events leading to the enactment or official policy in question"); *Wallace,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (considering prior version of statute in concluding that new version had religious purpose); *Books,* 235 F.3d at 304 (rejecting city's stated secular purpose

while noting that it was "issued on the eve of litigation").

The Court of Appeals for the Sixth Circuit recently applied the mandate of *Santa Fe* in a case involving a public display of the Ten Commandments. In *American Civil Liberties Union of Kentucky v. McCreary County*, 354 F.3d 438, 461–62 (6th Cir.2003), McCreary County had posted copies of the Ten Commandments in its courthouse and schools. After the plaintiffs sued the county, asserting a violation of the establishment clause, the county modified the displays to include excerpts from the Declaration of Independence, the Kentucky Constitution, the Mayflower Compact and other documents. In court, the county asserted that the purpose of the modified displays was "to demonstrate that the Ten Commandments were part of the foundation of American law and government." *Id.* In concluding that this purpose was a sham, the court noted "it was only upon fear of litigation that the displays were modified to include secular material in the hope of rendering the displays constitutional." *Id.* Like McCreary County, the City did nothing to diminish the perception of its endorsement until after the Foundation had filed one lawsuit and was threatening another one.

■ With respect to the Order's third argument, I agree that the City should not be penalized for attempting to comply with the law. However, the Constitution is more than just a code of procedure. Case law cannot be applied as if it were a "how-to" manual. Courts must look at the substance as well as the form of government action to determine whether it complies with the establishment clause. *City of Marshfield*, 203 F.3d at 491. Furthermore, it is not necessarily the City's attempt to copy *City of Marshfield* that is revealing but, again, its refusal to do so until after a lawsuit was filed and the City knew that the monument would be removed if it did not modify the display in some way.

■ The Order suggests that the City's actions should not be viewed as an attempt to *advance* Judeo–Christian beliefs by selling the parcel to the Order, but as an effort to *accommodate* the religious beliefs of its citizens. Certainly, the establishment clause does not require (and the free exercise clause would not allow) the government to exhibit hostility to religious expression or even to be completely indifferent to deeply held beliefs. *Zorach v. Clauson*, 343 U.S. 306, 314–15, 72 S.Ct. 679, 96 L.Ed. 954 (1952). "[T]he government may (and sometimes must) accommodate religious practices ... and may do so without violating the Establishment Clause." *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos*, 483 U.S. 327, 334, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). However, a government's ability to provide benefits to a religion is not without limit, even and perhaps especially when the majority of those in the community adhere to that religion. In a sense, "[a]ny [government action] pertaining to religion can be viewed as an 'accommodation' of free exercise rights." *Id.* at 347, 107 S.Ct. 2862 (O'Connor, J., concurring in judgment). Thus, the "principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause." *Lee*, 505 U.S. at 587, 112 S.Ct. 2649.

It is not always an easy task to determine when the government has stepped over the line of permissible accommodation and engaged in unconstitutional advancement of religion. However, this case does not test the boundaries of that line. The Supreme Court has approved governmental aid to religion in two circumstances: (1)

when special treatment is necessary to lift a burden to an adherent's ability to practice his or her religion, *Amos,* 483 U.S. at 338, 107 S.Ct. 2862 (no establishment clause violation when "government acts with the proper purpose of lifting a regulation that burdens the exercise of religion"); *see also Charles v. Verhagen,* 348 F.3d 601 (7th Cir.2003) (federal law that protects free exercise rights of prisoners is constitutional because it "seeks to remove only the most substantial burdens States impose upon prisoners' religious rights"); and (2) when the benefit is an incidental effect of a neutral program that does not take religion into account, *Zelman v. Simmons–Harris,* 536 U.S. 639, 652, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002) ("where a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the establishment clause"); *Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (sending of public school teachers into parochial schools to provide remedial education to disadvantaged children did not violate establishment clause because aid was allocated on basis of "neutral, secular criteria that neither favor[ed] or disfavor[ed] religion, and [was] made available to both religious and secular beneficiaries on a nondiscriminatory basis").

The sale of the parcel was neither part of a neutral program nor necessary to alleviate any burden on religious practices of Christians or Jews. A government act that benefits only one religious viewpoint may not be properly viewed as a permissible "accommodation" under the establishment clause. *Texas Monthly,* 489 U.S. at 11, 109 S.Ct. 890 ("In all of these cases [upholding benefits to religion], however,

we emphasized that the benefits derived by religious organizations flowed to a large number of nonreligious groups as well. Indeed, were those benefits confined to religious organizations, they could not have appeared other than as state sponsorship of religion."); *id.* at 28, 109 S.Ct. 890 (Blackmun, J., concurring in judgment). When the government allows adherents of one religion to use the machinery of the state to express its message, this is favoritism, not accommodation. *Lee,* 505 U.S. at 629–30, 112 S.Ct. 2649.

The Order argues that the City ought to be able "to accommodate ... the wishes of its citizens that the monument not be moved." Order's Br., dkt. # 107, at 20. It cites a statement in *Books,* 235 F.3d at 307, that government "has the right and, indeed the obligation to take into consideration the religious sensibilities of its people." Of course, this statement is true, but it does not support the Order's argument. The court did not suggest that a city may "accommodate" the religious beliefs of one group while disregarding those of different faiths. The City must consider the "religious sensibilities" of *all* its citizens and not just those of the majority. *Lee,* 505 U.S. at 577, 112 S.Ct. 2649 ("While in some societies the wishes of the majority might prevail, the Establishment Clause of the First Amendment is addressed to this contingency and rejects the balance urged upon us."); *Allegheny,* 492 U.S. at 601 n. 51, 109 S.Ct. 3086 ("To be sure, prohibiting the display of a crèche in the courthouse deprives Christians of the satisfaction of seeing the *government adopt* their religious message as their own, but this kind of government affiliation with particular religious messages is precisely what the Establishment Clause precludes.").

The City could have accommodated the beliefs of its religious citizens *without* giving the religious speech preferential place-

ment on city land. *Grumet,* 512 U.S. at 707, 114 S.Ct. 2481 (noting that state could have accommodated religious beliefs of Satmars without giving them preferential treatment). Instead, it could have given the monument back to either the Order or to the Episcopal church so that one of them could display it on their own land, outside the park. That solution would have had the added benefit of allowing the monument to be displayed without the arguably degrading fences and disclaimers.

Finally, I reject defendants' assertion that the July 14 opinion and order is inconsistent with *City of Marshfield,* 203 F.3d 487, in which the court of appeals upheld a city's sale of land containing a statue of Jesus Christ while also concluding that a perception of endorsement still remained, requiring the city to differentiate city property from the parcel sold. To be sure, there are a number of similarities between both cases. Both involve a religious object and a portion of a park that a city sold to a private group in an attempt to avoid an establishment clause violation. However, the court of appeals did not purport to establish a bright line rule that would decide every subsequent case involving a challenge to a religious display. Establishment clause cases are notoriously context sensitive. Both the Supreme Court and the court of appeals have emphasized that each case must be considered in light of all of the surrounding circumstances. *City of Marshfield,* 203 F.3d at 494 (" 'every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion' ") (quoting *Pinette,* 515 U.S. at 778, 115 S.Ct. 2440 (O'Connor, J., concurring)); *Lee,* 505 U.S. at 598, 112 S.Ct. 2649 ("Our Establishment Clause jurisprudence remains a delicate and fact sensitive one."); *Allegheny,* 492 U.S. at 629, 109 S.Ct. 3086 (determination of establishment clause violation "depends on a sensitivity to the unique circumstances and context of a particular challenged practice"); *Wallace,* 472 U.S. at 61, 105 S.Ct. 2479 (court must keep in mind "the myriad subtle ways in which Establishment Clause values can be eroded").

There are several important differences between this case and *City of Marshfield.* First and perhaps most important, in *Marshfield,* the plaintiffs' challenge to the sale was narrow. They relied solely on *Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), which presented the question whether a formerly public park could segregate on the basis of race when the city continued to maintain the park. The Court held that segregation would still violate the Fourteenth Amendment under these circumstances. In *Marshfield,* the plaintiffs relied on *Evans* to argue that even though a private organization now owned the statue, there was still "state action" for purposes of the establishment clause because the buyer and the city were "completely interdependent and [were] joint participants in the challenged activity." Br. for Appellants at 22, *Freedom From Religion Foundation, Inc. v. City of Marshfield,* 203 F.3d 487 (7th Cir.2000) (No. 99–1639), *attached to* Aff. of Manion, dkt. # 115, Exh. A. Thus, the plaintiffs argued, the sale should be disregarded and the city should continue to be viewed as the true speaker. The court of appeals rejected this argument because it concluded that the sale "effectively ended the state action," distinguishing *Evans* because Marshfield had "ceased maintaining and providing electrical service" for the property." *City of Marshfield,* 203 F.3d at 492. The plaintiffs did not argue that the *sale itself* demonstrated a preference for a particular religious viewpoint and the court of appeals did not consider this possibility.

In this case, I have assumed that the Order's post-sale display of the monument

on the parcel does not constitute "state action." *But see Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (state action may be present when government provides "significant encouragement" to private party, "either overt or covert"). My conclusion that the City failed to cure the establishment clause violation is based on the premise that the City's sale of land to the Order was an independent violation of the Constitution regardless whether the Order chose to continue displaying the monument after the sale. This difference alone counsels against a mechanical application of the result in *City of Marshfield.*

Second, the size of the parcel sold in this case (22′ × 20′) is substantially smaller than the one in *City of Marshfield* (.15 acres). Thus, the Marshfield parcel could be reasonably viewed as an actual park and a separate space; it is almost farcical to say that 22′ × 20′ parcel is a separate "park," apart from Cameron. As a result, no matter how many fences or signs the City and the Order build, it is impossible to defeat the impression that the monument is still part of the City's property.

Third, the City's actions in this case evince a religious purpose more strongly than did those of Marshfield. In *City of Marshfield,* the facts as recited by the court of appeals do not indicate that the city was attempting to keep the monument where it was; it simply accepted the offer that was presented to it. In this case, the City had at least three alternatives to the sale of the land, including an offer by the Order to move the property. The City rejected each of those options and instead approached the Order on its own initiative about selling the Order the parcel. In addition, Marshfield began to act within a couple of months of receiving the plaintiffs' request to move the statue by putting up a disclaiming sign and accepting a private

party's offer to purchase the land. In this case, the City refused to take any action for more than *15 years* after the Foundation first requested that the monument be moved.

It is true that Marshfield did not sell the park until after the plaintiffs had filed a lawsuit and the court did not consider this fact in conducting its establishment clause analysis. However, *City of Marshfield* was decided before both *Books* and *Santa Fe,* in which both the court of appeals and the Supreme Court *did* consider the government's past conduct in finding violations of the establishment clause. To the extent that *City of Marshfield* is inconsistent with *Books* and *Santa Fe,* it is the Supreme Court and more recent court of appeals cases that I must follow. Further, in *City of Marshfield,* the plaintiffs waited only a month from the time they first requested the statue's removal until they filed a lawsuit. It would have been difficult for Marshfield to act more swiftly than it did.

Accordingly, despite defendants' vigorous protestations to the contrary, I conclude that the holding in *City of Marshfield* does not decide this case. I adhere to the conclusion in the July 14 opinion and order that the City's sale of the parcel violated the establishment clause.

## C. *Remedy*

As plaintiffs point out, because I have concluded that the sale violated the establishment clause, the question of the appropriate remedy must be decided in light of the fact that the monument still sits on public property and is owned by the City. This makes inapplicable the court of appeals's discussion of the appropriate remedy in *City of Marshfield* because in that case, the court did not invalidate the sale. Thus, in drawing a remedy for the perception of endorsement of the statue, the court started from the premise that "our

holding limits private speech in a public forum." *City of Marshfield,* 203 F.3d at 497. Because a private land owner could not "be estopped from exercising its right to free exercise and freedom of speech on its own property," the court held that the appropriate remedy was to require the defendants to "differentiate between property owned by the [private group] and property owned by the City." *Id.*

In this case, I have concluded that the City's sale itself demonstrated a preference for the religious message of the monument and, therefore, the violation cannot be cured by fences and signs. Further, because I have concluded that displaying the monument by itself in a public park violates the establishment clause, the monument cannot remain in the park as it is now. *City of Plattsmouth,* 186 F.Supp.2d at 1036 (enjoining city from retaining Ten Commandments monument in park "as it is now situated").

Nevertheless, any injunction must still be narrowly tailored to remedy the constitutional violation. *Doe,* 964 F.2d at 620. One way that the City could have attempted to comply with the establishment clause rather than give a Judeo–Christian message preferred access to public property would have been to maintain the disclaiming signs and open up the park to other groups that want to express their own messages. *E.g., Pinette,* 515 U.S. at 762, 115 S.Ct. 2440 (plurality opinion) (finding no municipal endorsement of cross erected by Ku Klux Klan on state property when property "had been opened to the public for speech, and permission was requested though the same application process and on the same terms required of other private groups"; any perceived endorsement could have been vitiated by disclaiming signs); *Doe,* 964 F.2d at 628 (Flaum, J., concurring) (city may terminate endorsement by adopting equal access policies or

taking steps to insure equal access in practice). However, the City has never suggested that it has any interest in pursuing this option. Perhaps like other communities experiencing similar controversies, the City is wary of the types of displays it would have to accept if it used content-neutral criteria in evaluating them. *See* Brad Hem, "Council votes to move monument," *Idaho Statesman,* at 1 (Jan. 21, 2004) (Boise city council voted to remove Ten Commandments monument from public park after receiving request from Reverend Fred Phelps to erect another monument "claiming that Matthew Shepard is in hell because he was gay"; Phelps had argued that it would violate his constitutional rights to allow Ten Commandments display but reject his own); Associated Press, "Casper to move monument," *Deseret News,* at A15 (Oct. 30, 2003) (city voted to move monument from public park after rejecting Phelps's request to erect anti-gay monument).

As suggested above, another possibility would have been to sell the entire park so that the City could completely "divorce" itself from the religious speech. *Santa Fe,* 530 U.S. at 302, 120 S.Ct. 2266. However, this option could be problematic if the sale's only purpose was to maintain the monument's location and continue the promotion of its message. *See Paulson v. City of San Diego,* 294 F.3d 1124, 1132 (9th Cir.2002). In any event, neither the Order nor the City has suggested this remedy as a viable option. At $6.00 for every square foot (the City's estimate of fair market value for the land), the 65,000 square foot park would cost $390,000, a price the Order is unlikely to be able to pay.

Thus, at least for the time being, the only effective way to end the City's endorsement of the monument is to remove it from the park. *Doe,* 964 F.2d at

622 ("the Establishment Clause may require the removal of such religious display if there is no other narrowly-tailored manner of avoiding the appearance of governmental endorsement of the message."); *see also Allegheny,* 492 U.S. at 602, 109 S.Ct. 3086 (concluding that crèche display "in this context … must be permanently enjoined"); *O'Bannon,* 259 F.3d at 769 (affirming district court's preliminary injunction against state's display of Ten Commandments display on statehouse grounds). Perhaps the most neutral method of ending the City's endorsement would be to hold a public auction for the monument or give the monument away through a drawing. However, I do not believe the Constitution requires this level of indifference to religion. The establishment clause "does not preclude the government from acknowledging religion or from taking religion into account in making law and policy." *Wallace,* 472 U.S. at 70, 105 S.Ct. 2479 (O'Connor, J., concurring). The City may respect the "religious sensibilities" of its citizens who follow the Ten Commandments by giving the monument to a person or group that wishes to give the monument the respectful display that it deserves in another forum. Thus, the City "retains the authority to make decisions regarding the placement of the monument," provided that it remains consistent with the commands of establishment clause as stated in this opinion. *Books,* 235 F.3d at 307.

I reiterate my hope expressed in the July 14 opinion and order that the citizens of La Crosse will recognize that prohibiting the City from displaying the monument in its current context does not degrade the monument's religious message or suggest that the government must endorse atheism to avoid an establishment clause violation. *Allegheny,* 492 U.S. at 610, 109 S.Ct. 3086 ("A secular state, it must be remembered, is not the same as an atheistic or antireligious state. A secular state establishes neither atheism nor religion as its official creed.") In fact, the effect is just the opposite. Without doubt, religion has an exalted place in American society. *Schempp,* 374 U.S. at 226, 83 S.Ct. 1560. But religious beliefs are "too personal, too sacred, too holy" to permit the government to become involved in their promotion. *Engel v. Vitale,* 370 U.S. 421, 432, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). "The design of the Constitution is that preservation and transmission of religious beliefs and worship [are] a responsibility and a choice committed to the private sphere, which itself is promised freedom to pursue that mission." *Lee,* 505 U.S. at 589, 112 S.Ct. 2649. The best way to insure religious liberty for all is to keep the government from choosing sides, even when it means that the wishes of the largest majority must be given no more concern or respect than the tiniest sect.

### ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by intervening defendant Fraternal Order of the Eagles is DENIED.

2. On the court's own motion, plaintiffs are GRANTED summary judgment.

3. It is DECLARED that defendant City of La Crosse violated the establishment clause, both by displaying a monument of the Ten Commandments in Cameron Park and by selling a portion of the park to intervening defendant Fraternal Order of the Eagles. The sale is invalidated; it is the responsibility of the City and the Order to take the necessary steps to undo the sale.

4. Defendant City of La Crosse must remove the monument from Cameron Park.

5. The clerk of court is directed to enter judgment in favor of plaintiffs and close this case.