# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 04-1321 & 04-1524

SUE MERCIER, ELIZABETH J. ASH,
ANGELA BELCASTER, et al.,

*Plaintiffs-Appellees,*

*v.*

FRATERNAL ORDER OF EAGLES,
LA CROSSE AERIE 1254,

*Intervening Defendant-Appellant,*

and

CITY OF LA CROSSE,

*Defendant-Appellant.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 02 C 376—**Barbara B. Crabb**, *Chief Judge.*

ARGUED SEPTEMBER 8, 2004—DECIDED JANUARY 3, 2005

Before BAUER, MANION, and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* For almost forty years, a monument inscribed with the Ten Commandments (the "Monument")

has occupied a spot in Cameron Park, a public park in the City of La Crosse, Wisconsin ("La Crosse" or the "City"). Recently, certain residents of La Crosse, joined by an advocacy group, sued the City claiming the Monument violated the Establishment Clause of the First Amendment. In response, La Crosse sold a portion of the park and the Monument to the Order of Eagles, the service organization that had originally donated the Monument to the City. The district court held that this sale violated the Establishment Clause. We reverse.

## I.

In the fall of 1964, the local chapter (or "Aerie") of the Fraternal Order of Eagles (the "Eagles") requested the permission of the City to install in Cameron Park ("Cameron Park" or the "Park") a granite monument bearing an inscription of the Ten Commandments and adorned with certain religious and other symbols associated with this country (an eagle grasping the American flag in its talons and the "all-seeing eye" most often associated with the one dollar bill).[1] The La Crosse Park Board considered the proposal at its September 8, 1964 meeting and, on October 5, 1964, gave the Eagles permission to erect the Monument in the Park.

---

[1] The Monument at issue in this case is identical to the monument considered by this court in *Books v. City of Elkhart*, 235 F.3d 292 (7th Cir. 2000). In fact, both monuments were part of the same program organized by the Eagles. The only difference in the monuments is the inscription providing the name of the city receiving the monument, the number of the Aerie making the presentation, and the date of the presentation. For a history of the Eagles' monument program as well as a fuller physical description of the monuments, see *id.* at 294-96.

The installation ceremony was scheduled to coincide with the Eagles' Sixty-third Annual Convention to take place in La Crosse in June, 1965. The particular location of the Monument within the Park was left to the determination of the City's director of parks and recreation.

Cameron Park occupies one and one-half acres in downtown La Crosse. The Park is classified by the City as a "neighborhood park." According to the City's 1993 "Park and Recreation Plan," "the purpose of a neighborhood park is to provide an attractive neighborhood setting and a place to be used primarily for recreation for people of all ages." La Crosse owns more than 1,300 acres of land designated as parkland. Of that parkland, fifty-six acres are designated as neighborhood parks.

The Park, rectangular in shape, is bordered on three sides by sidewalks and public streets, and on one side by private property. A map of the Park shows that it is intersected by walkways and dotted with trees. The Park is surrounded by commercial property, including a bank and a restaurant. There are no governmental buildings within sight of the Park, and it is not necessary to walk through or past the Park to enter into any governmental buildings.

The parks and recreation director chose a location for the Monument very near the northeastern corner of the Park. The Monument is placed seventeen feet south from a sidewalk bordering the park and sixty feet west from another sidewalk bordering the park.[2] Although there is a walkway through the Park and near the Monument, it runs behind

---

[2] As indicated above, the Park is rectangular in shape with its long sides running east and west and its significantly shorter sides running north and south. We have included with this opinion a map of the Park as well as pictures of the Monument.

the face of the Monument, and a visitor walking along the walkway would not see the inscription. The Monument does not occupy a particularly privileged location in the aesthetic scheme of the Park. The attention of visitors to the Park is not drawn to the Monument by it being displayed in a particularly prominent location or setting (such as, for instance, on a hill overlooking the surrounding landscape or at the center of the Park with walkways leading the visitor to the Monument). The location of the Monument near the corner of the Park was not, however, accidental. The Monument is, and has been since its construction, directly across from the Eagle's La Crosse headquarters and the Monument's inscription faces the headquarters.[3]

In April 1965, after the approval of the Monument but before its installation, La Crosse suffered severe flooding from the Mississippi River. Several hundred high-school students from the area, and as far away as Milwaukee, volunteered to help with flood-fighting efforts, particularly the filling of more than 51,000 sandbags. The students' efforts were recounted in a "special flood edition" of the local newspaper.

Two months later, on June 19, 1965, the Monument was dedicated. Participants in the dedication ceremony included Alvin A. Watson, a past president of the La Crosse Aerie, a minister of the local Lutheran church, a state judge, and the president of the Park Board. In his remarks dedicating the

---

[3]   As we describe below, the attention of passers-by is directed to the Monument at night by a spotlight on the roof of the Eagles' headquarters that illuminates the Monument. This spotlight is not, however, part of the design or layout of the Park and is provided at the sole expense of the Eagles. There is no indication in the record that La Crosse has approved (other than passively), or coordinated with the Eagles, the use of the spotlight.

Monument, Watson paid tribute to the youth who helped fight the flood in April. The local paper reported the next day that the Monument "was dedicated especially to those young people who helped during this spring's flood."

For the next twenty years the Monument generated little (if any) controversy. During that time (and through today), the Eagles assumed full responsibility for the preservation and maintenance of the Monument. Members of the Eagles have planted and watered a small flower bed surrounding the Monument. Further, the Monument has been illuminated at night by a light attached to the roof of the Eagles' building. The City has expended no funds in maintaining the Monument.

In 1985, Phyllis Grams, a resident of La Crosse, joined by the coordinating Appellee in this case, the Freedom From Religion Foundation, Inc. (the "Foundation"), wrote a letter to the La Crosse Common Council, asking that the Monument be removed from the Park. The Council denied the request, and Grams and the Foundation filed a lawsuit in the United States District Court for the Western District of Wisconsin, contending that the location of the Monument in the Park violated the Establishment Clause of the First Amendment to the Constitution. This case was eventually dismissed in 1987 for lack of standing. *Freedom From Religion Foundation, Inc. v. Zielke*, 663 F. Supp. 606 (W.D. Wis. 1987), *aff'd* ,845 F.2d 1463 (7th Cir. 1988).

More than a decade later, in June 2001, the Foundation again asked the City to remove the Monument from the Park. The City Council again refused. In September 2001, the Secretary for the La Crosse Aerie wrote to the City's attorney and offered to take back the Monument and display it in a location visible to the public. The City declined the offer. In March 2002, a local Episcopal church also offered to move the Monument to another location. The City again

declined the offer. Finally, the Foundation also offered to move the Monument to another location. Again, the City declined the offer. In April 2002, the City Council addressed the Monument controversy and passed a resolution. The resolution noted that: 1) there was a threat of a renewed lawsuit by the Foundation, 2) the Monument was given to the City to honor the flood-fighting effort of area youth, 3) the Council believed the Monument did not violate the Constitution, 4) the Monument deserved to remain in its current location, and 5) the Council would take the necessary steps to keep the Monument in its current location.

By June 2002, the City reached what it saw as a solution and decided to sell the Monument to the Eagles along with a twenty-foot by twenty-two-foot parcel of land under and surrounding the Monument. On June 20, 2002, the La Crosse Parks Commission recommended the sale of this parcel.

On July 1, 2002, the Foundation, joined by two fictitiously named plaintiffs, filed a suit against the City challenging the display of the Monument in the Park. The district court later denied the individual plaintiffs' motion to proceed anonymously. On August 7, 2002, twenty additional individuals were named as plaintiffs. Each of the individual plaintiffs asserted essentially the same facts. They are all residents of La Crosse and claim that they avoid the Park because of the presence of the Monument, or that they are emotionally disturbed or distressed when they travel to one of the commercial businesses surrounding the Park because of the presence of Monument.

Ten days after the Foundation filed its suit, on July 11, 2002, the City Council adopted, by a 5-3 vote, a resolution: authorizing the sale of the parcel; directing the City Assessor to determine the fair market value of the parcel; and authorizing the Mayor and City Clerk to execute any necessary deeds to effectuate the sale of the parcel. The resolution also

noted that the Monument had been dedicated to the flood fighters. The resolution cited as authority for the sale of the parcel Wisconsin Statute § 27.08. This statute grants a city council the power, in conjunction with a city's board of park commissioners, to sell park land when that land is no longer needed for park purposes.[4] In the resolution, the La Crosse City Council stated that the parcel at issue was no longer needed for park purposes.

The sale to the Eagles took place on August 21, 2002. As indicated above, the plot of land sold to the Eagles was roughly a twenty-foot by twenty-two-foot area of the Park (440 square feet) where the Monument was located. This plot is bordered on three sides by the Park and on one side by a sidewalk. The City Assessor had previously determined that the fair market value of the parcel at issue was $2,640 or $6.00 per square foot. The Eagles paid this amount. The quitclaim deed recording the transfer provided that "appropriate fencing, landscaping and signage shall be provided by 10/24/02 and maintained in order to commemorate the youth of the La Crosse area for their assistance and great help for the spring, 1965 flood that the City of La Crosse experienced."

---

[4]  Wisconsin Statute § 27.08 provides in pertinent part:

> (2) The board of park commissioners is empowered and directed:
>
> > (c) Subject to the approval of the common council to buy or lease lands in the name of the city for park, parkway, boulevard or pleasure drive purposes within or without the city and, with the approval of the common council, to sell or exchange property no longer required for its purposes.

Wis. Stat. § 27.08(2)(c).

In October 2002, the Eagles erected a four-foot-high steel fence around the parcel. Temporary signs were later added which read "This is the property of the La Crosse Eagles Aerie 1254." In March 2003, these temporary signs were replaced with permanent signs on all four sides of the fence stating,

**This is the property of**

**La Crosse Eagles**

**Aerie 1254**

**Dedicated to the volunteers who**

**helped save the city of La Crosse**

**during the 1965 flood.**

Below this wording is a picture of volunteers filling sandbags during the 1965 flood.

One month later, the City of La Crosse erected a second fence, this one wrought-iron and, like the first fence, four feet high, almost immediately outside the fence erected by the Eagles. On the north and south sides of this fence are metal signs. On these signs in ten-inch high black letters is the statement "PRIVATE PARK." Beneath this statement, in four-inch black letters, are the words: "THIS PROPERTY IS NOT OWNED OR MAINTAINED BY THE CITY OF LA CROSSE, NOR DOES THE CITY ENDORSE THE RELIGIOUS EXPRESSION THEREON."

The Foundation and the individual plaintiffs (collectively, the "Appellees") were not appeased, however. The Appellees amended their complaint after the sale of the plot, and again after the fences were constructed. The Appellees continued to assert that the presence of the Monument in the Park, despite the sale, violated the Establishment Clause.

The district court agreed and in July 2003, granted summary judgment in favor of the Appellees. *Mercier v. City of La Crosse*, 276 F. Supp. 2d 961 (W.D. Wis. 2003). The district court held that the City's display of the Monument before the sale to the Eagles violated the Establishment Clause, *id.* at 972-74, and that the sale of the Monument to the Eagles did not terminate the violation, *id.* at 974-78. The district court also held that the appropriate remedy for the violation was the return of the plot of land to the City and the removal of the Monument from the Park. *Id.* at 979.

Shortly after formal judgment was entered in favor of the Appellees, however, the Eagles, who had not been a party to the suit, moved to intervene and, at the same time, moved the district court to alter, amend, or grant relief from, its judgment under Federal Rules of Civil Procedure 59(e) and 60(b). The district court agreed with the Eagles that it should have been a party to the suit, granted the motion to intervene, vacated its judgment, and permitted the Eagles to conduct limited discovery.

At the close of its discovery, the Eagles moved for summary judgment. On February 3, 2004, the district court denied the Eagles' motion and, *sua sponte*, granted summary judgment in favor of the Appellees. *Mercier v. City of La Crosse*, 305 F. Supp. 2d 999 (W.D. Wis. 2004). In granting summary judgment to the Appellees, the district court again held that the display of the Monument at the Park prior to the sale constituted a violation of the Establishment Clause. *Id.* at 1005-09. The district court also held that the sale of the plot was, itself, regardless of what happened to the Monument after the plot was sold, an independent violation of the Establishment Clause. *Id.* at 1019. As in its earlier decision, the district court concluded that the only remedy available was the invalidation of the sale of the plot and the removal of the Monument from the Park. *Id.* at 1019-20. This appeal followed.

## II.

On appeal, the City and the Eagles challenge the district court's grant of summary judgment in favor of the Appellees.[5] Our review is *de novo. McPherson v. City of Waukegan*, 379 F.3d 430, 437 (7th Cir. 2004). A party is entitled to summary judgment in its favor when "there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law." *Id.*; Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The parties agree that there are no material facts in dispute. The only question, therefore, is whether the Appellees are entitled to judgment as a matter of law.

The First Amendment to the United States Constitution provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion. . . ." U.S. Const. amend. I, cl. 1. This provision, the Establishment Clause, is made applicable to the States through the Fourteenth Amendment. *Everson v. Bd. of Educ. of the Township of Ewing*, 330 U.S. 1, 15 (1947).

In recent years, this court has considered in various contexts whether the government's use or display of religious imagery violates the Establishment Clause. *See, e.g., Ind. Civil Liberties Union v. O'Bannon*, 259 F.3d 766 (7th Cir. 2001); *Books v. City of Elkhart*, 235 F.3d 292 (7th Cir. 2000); *Gonzales v. North Township*, 4 F.3d 1412 (7th Cir. 1993); *Harris v. City of Zion, Lake Cty., Ill.*, 927 F.2d 1401 (7th Cir. 1991); *American Jewish Congress v. City of Chicago*, 827 F.2d 120 (7th Cir. 1987). That is not precisely what we are asked to resolve here. We are not concerned with whether the installation and

---

[5]   Because we conclude that the district court erred in granting summary judgment to the Appellees, we need not consider the arguments concerning the district court's remedy.

presence of the Monument on public land (a municipally owned park) from 1965 to 2002 violated the Establishment Clause. Although the district court reached such a conclusion in its order and opinion granting summary judgment in favor of the Appellees, neither the Eagles nor the City challenge that holding in this court.

We need not, therefore, decide whether the display of the Ten Commandments in a neighborhood park violated the Establishment Clause.[6] We will assume, however, the district court was correct in order to reach the issue that *is* before this court: whether the sale by the City to the Eagles of the plot of land underneath and surrounding the Monument was an independent violation of the Establishment Clause.

In support of their position that the sale of the Monument and land to the Eagles was constitutionally permissible, the Eagles and the City rely extensively on this court's decision in *Freedom From Religion Found., Inc. v. City of Marshfield*, 203 F.3d 487 (7th Cir. 2000). The Appellees argue in response that *Marshfield* is not controlling. We turn to *Marshfield* itself to resolve this disagreement.

---

[6] In *Books*, this court held a Ten Commandments monument displayed outside the City of Elkhart's municipal building violated the Establishment Clause. 235 F.3d at 304. Applying *Books*, in *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766 (7th Cir. 2001), this court held a Ten Commandments display on the grounds of the Indiana capitol complex violated the Establishment Clause. The Supreme Court recently granted certiorari in two cases to consider the constitutionality of Ten Commandments displays on public property. *McCreary County, Ky. v. ACLU of Ky.*, 125 S.Ct. 310, 2004 WL 2059432 (Oct. 12, 2004); *Van Orden v. Perry*, 125 S.Ct. 346, 2004 WL 2282082 (Oct. 12, 2004).

**A.** *Marshfield*

In 1959, the local chapter of the Knights of Columbus, a Roman Catholic laymen's organization, donated to the City of Marshfield, Wisconsin, a statue of Jesus Christ. *Id.* at 489. The city accepted the gift and placed the statue on land owned by the city. *Id.* The statue was (and is) fifteen feet in height and "depicts Christ, arms open in prayer, standing atop a large sphere, which in turn rests atop a base bearing the inscription in twelve-inch block letters 'Christ Guide Us On Our Way.' " *Id.* The statue overlooks "the main thoroughfare into Marshfield from the south, and is clearly visible to travelers from the road." *Id.* A few years after the statue was installed, a member of the Knights of Columbus agreed to help Marshfield construct signs, picnic tables, and outdoor grills at the site, and the city agreed to designate the property as a city park. *Id.* The city also provided the site with electricity. *Id.*

Nearly forty years after the statue was installed, the Foundation requested that the city remove the statue. *Id.* When the city refused, the Foundation, joined by a local resident, sued the city claiming the presence of the statue in a city-owned park violated the Establishment Clause. *Id.* Shortly after the suit was filed, a group of Marshfield residents (referred to in *Marshfield* as the "Fund") purchased from the city the land underneath and surrounding the statue. *Id.* at 489-90. The city separated out the electrical service required for lighting the statue from the cost of lighting the rest of the park, and the cost of lighting the statue is paid by the Fund. The city also placed a disclaimer near the statue stating that the location of the statue did not constitute an endorsement of religion.

On appeal in *Marshfield*, the plaintiffs argued that the sale was a sham and, as such, the sale itself "constitute[d] an en-

dorsement of religion by the City." *Id.* at 491. The plaintiffs also argued that the sale did not end "the government endorsement of religion, because the continued presence of the statue in proximity to a public park may still reasonably be perceived as the City's endorsement of religion." *Id.* at 490.

Considering whether the sale of the statue was proper, this court noted that "[a]bsent unusual circumstances, a sale of real property is an effective way for a public body to end its inappropriate endorsement of religion." *Id.* at 491. We cautioned, however, that given the risk of manipulation in a "formalistic standard," a court must "look to the substance of the transaction as well as its form to determine whether government action endorsing religion has actually ceased." *Id.* This court held that the sale of the statue by the City of Marshfield was proper because the city performed the necessary formalities to transfer ownership of the parcel, sold the parcel for a fair price, and the Fund "assumed the traditional duties of ownership." *Id.* at 492.

This court also held, however, that despite the formal sale of the property, "the proximity of the statue to City property and the lack of visual definition between City and Fund property creates a perception of improper endorsement of religion by the City and constitutes a violation of the Establishment Clause." *Id.* at 496. This court noted that the parcel of land sold by Marshfield was "not physically differentiated from the surrounding public park, and no visual boundaries currently exist that would inform the reasonable but unknowledgeable observer that the Fund property should be distinguished from the public park." *Id.* at 494. This court also noted that "the statue's positioning and orientation combine with the other physical features to convey the impression that the statue is on city park property." *Id.* at 495.

On remand, this court instructed the district court, together with the parties, to develop some way "to differentiate between property owned by the Fund and property owned by the City." *Id.* at 497. The remedy reached by the district court on remand is, not coincidentally, similar to the steps taken by La Crosse after its sale of the parcel at issue in this case.[7] The district court ordered the installation, on Marshfield's property, of a four-foot-high wrought-iron fence. *Freedom From Religion Found., Inc. v. City of Marshfield*, No. 98-C-270-S, 2000 WL 767376, at *1 (W.D. Wis. May 9, 2000). Attached to the fence, the district court ordered the installation of two signs, each reading,

**Private Park**

**This property is not owned or maintained by the City of Marshfield, nor does the City endorse the religious expressions thereon.**

*Id.* The district court ordered that "[t]he text 'Private Park' will be in ten (10) inch block letters while the subsequent text will be in four (4) inch block letters." *Id.* Recall that the fencing and signs installed by La Crosse is identical (even to the point of having the same-size lettering) to that ordered by the district court in *Marshfield*.


**B.  The Present Case**

As noted above, the parties (and the district court) dispute the significance of *Marshfield*. The Eagles and the City argue that *Marshfield* compels judgment in their favor. Quoting this

---

[7] On remand, the Foundation, a plaintiff in *Marshfield*, proposed as a remedy a ten-foot masonry wall surrounding the statue. *Freedom From Religion Found., Inc. v. City of Marshfield*, No. 98-C-270-S, 2000 WL 767376, at *1 (W.D. Wis. May 9, 2000).

court's statement in *Marshfield* that "[a]bsent unusual circumstances, a sale of real property is an effective way for a public body to end its inappropriate endorsement of religion," *id.* at 490, the Eagles and the City argue that there are no unusual circumstances to call into question the sale.

Conversely, the Appellees argue that *Marshfield* is not controlling because that case considered only whether the city remained "excessively entangled with the private owner because a restrictive covenant required that the private owner maintain the property as a park." *Marshfield* did not address, according to the Appellees (and the district court), whether the sale itself, particularly in light of competing offers to relocate the Monument to private property, demonstrated a preference for, and therefore an endorsement of, religion by the City. They claim this selective sale constituted an independent violation of the Establishment Clause.

The Appellees, however, misread *Marshfield*. *Marshfield* considered not just whether the restrictive covenant was constitutional, but also whether the sale itself was a sham and constituted an endorsement of religion by the City, as well as whether the City continued to violate the Establishment Clause after selling the property to a private party. *Marshfield*, 203 F.3d at 490-91. *Marshfield* concluded that the sale was proper and not an unconstitutional endorsement of religion. *Id.* at 491.

As noted above, the Appellees attempt to discount *Marshfield* by claiming the case concerned only whether the sale inextricably entangled the City with the private owners (and thus the statue) because a restrictive covenant required the private owner to maintain the property as a park. It is true that in *Marshfield* the court concluded that the restrictive covenant did not improperly entangle the City, but this

court went further, holding that the sale itself did not constitute an unconstitutional endorsement of religion. *Id.* at 491. This court also held that "our independent review of the facts here leads us to conclude that this sale validly extinguished any governmental endorsement of religion." *Id.* at 492. We also stated that "[a]bsent unusual circumstances, a sale of real property is an effective way for a public body to end its inappropriate endorsement of religion." *Id.* at 491. Thus, although *Marshfield* focused on the original placement of the statue and whether the sale rectified the Establishment Clause violation, that case also made clear that the sale of the parcel was permissible under the Establishment Clause.

In the present case, La Crosse executed just such a sale. On the assumption that the Monument's placement in a public park constituted a constitutional violation, in line with *Marshfield*, the sale would appear to have ended La Crosse's "endorsement" of religion. But the district court held, and the Appellees now argue, that even if that sale ended the existing violation, the reasons for the sale caused the City to commit a second violation. The City Council knew that it was faced with a lawsuit seeking the removal of the Monument on the theory that the location of the Monument violated the Establishment Clause. Although it had three separate offers (from the Eagles, a church, and the Foundation) to move the Monument to a different location, the Council instead chose to sell the Monument site to the Eagles. Although the City no longer owned the parcel, the Appellees claim that because the Council members knew that the sale would keep the Monument in its challenged location, the sale itself favored the religious purpose of the Monument, and thus that act was unconstitutional.

To begin with, the Appellees have no legal precedent for this assertion. The desire to keep the Monument in place

cannot automatically be labeled a constitutional violation. Removal is always an option, but as *Marshfield* holds, it is not a necessary solution to a First Amendment challenge. The court in *Marshfield* approved the sale when removal was obviously an option, so the Appellees' complaint that the City of La Crosse exercised the wrong option is contrary to the holding in *Marshfield*.

In short, *Marshfield* authorized an alternative to removal—a sale that did not involve "unusual circumstances." This does not mean, as the Appellees suggest, that if the La Crosse sale is valid, every sale of public space where a religious display is located would be permissible. The Supreme Court, and this court, have emphasized the case-by-case nature of a court's review of an alleged Establishment Clause violation. *See, e.g., Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290, 315 (2000) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 694 (1984) (O'Connor, J., concurring)) ("Every government practice must be judged in its unique circumstances . . . ."); *Books*, 235 F.3d at 302. The same holds true for efforts to end a violation. Simply because we find in this case that the sale by the City of La Crosse did not violate the Establishment Clause does not mean, as *Marshfield* made clear, that every such sale would be permissible. Here, we are focused upon the sale of the property in response to litigation undertaken to remove a monument that has stood undisturbed on governmental property for forty years. We are not endorsing a non-remedial initiative designed to sell off patches of government land to various religious denominations as a means of circumventing the Establishment Clause. We therefore reject the idea that the sale was a violation of the Establishment Clause simply because the City had other options.

The sale, however, must still satisfy the requirements of *Marshfield*, namely, there must be no unusual circumstances

surrounding the sale of the parcel of land so as to indicate an endorsement of religion. *Marshfield* highlighted some "of the typical sort of improprieties that might cause us to disregard a transaction." *Id*. at 492. Such improprieties would include a sale that did not comply with applicable state law governing the sale of land by a municipality, *id.*; a sale to a straw purchaser that left the City with continuing power to exercise the duties of ownership; or a sale well below fair market value resulting in a gift to a religious organization. *Id.*

In this case, the sale complied with Wisconsin state law and the Eagles paid the market rate, as determined by the City Assessor. The Eagles also assumed the traditional duties of ownership. Although the Appellees point to the fact that the land was offered solely to the Eagles, that was also true in *Marshfield*, where the City of Marshfield did not solicit alternative bids for the statue. *Id.*

Moreover, to the extent any facts differ materially from the facts in *Marshfield*, they militate in favor of a conclusion that the sale of the parcel of land and the Monument by the City was constitutionally permissible. For example, the City had an historical reason—the 1965 flood and the youth who helped protect the city—for keeping the Monument in place. And the Eagles, whose headquarters were located directly across the street from the Monument, would continue to maintain it at no expense to the City. While the historical benefit would remain, the sale would extricate the City from any perceived endorsement of the religious wording on the Monument. These features may be unique to La Crosse, but they do not entail the "unusual circumstances" that would otherwise override the type of legitimate sale approved by *Marshfield*.

The location of the Monument is also significant. The parcel sold by the City is not located near, or in, any gov-

ernmental building. Residents of La Crosse do not pass by the Monument to attend court hearings, pay fines, meet with government officials or employees, or participate in any other way in the civic affairs of La Crosse. Although Cameron Park is public property, it is a park and is not, like a courthouse, capitol building, or even the grounds of a government complex, "a setting where the presence of government is pervasive and inescapable." *American Jewish Congress v. City of Chicago*, 827 F.2d 120, 126 (7th Cir. 1987). *Cf. Books*, 235 F.3d at 305 ("[We subject] to particularly careful scrutiny displays at the seat of government.").

La Crosse is not selling property inextricably linked with the seat of government. Obviously, a city could not sell space under the dome of its City Hall or the sidewalk in front of the courthouse steps. Such sale would be, on its face, a sham. Instead, the location in a neighborhood park nowhere near the seat of government separated the Monument from the "particularly careful scrutiny" this court required in *Books*. Moreover, the parcel is not particularly prominent within the layout of the Park. It is not, as mentioned above, set at the heart of the Park or in a particularly prominent location where the sale would eviscerate the design or plan of the Park's layout. By selling the parcel around the Monument, the City has not suddenly deprived the visitors to the Park of normal access and enjoyment. Visitors to the Park remain free to utilize the park grounds, much the same way as before the sale. Other than the twenty by twenty-two-foot-space fenced around the Monument, which has occupied the space for forty years, access to the Park is not limited by the now-private parcel.

In addition, the buyer of the parcel has a long-standing and important relationship with the Monument. It was the Eagles, of course, who donated the Monument to the City in the first place and it is the Eagles who have maintained the

Monument. Selling the Monument to the Eagles, rather than removing it, also makes practical sense—the Eagles head-quarters is, and has long been, directly across the street from the Monument. The members will also continue to carefully maintain the site.

Finally, we cannot ignore the somewhat extensive effort made to distinguish the now-private property from the Park. As we stated above, the parcel is surrounded by two fences adorned by six signs, four of which state the parcel is owned by the Eagles and refers to the 1965 flood, and two that state the parcel is not owned by the City. These last two signs also disclaim any endorsement of the Monument by the City. Contrary to the district court's statement that "no matter how many fences or signs that City and the [Eagles] build, it is impossible to defeat the impression that the monument is still part of the City's property," 305 F. Supp. 2d at 1019, the impression that the Monument is no longer part of the City's property could not be any clearer. Any reasonable person walking past the Monument (either in front or behind) will quickly recognize that the Monument, what-ever its past history, is not the property of the City of La Crosse. Therefore, this sale clearly meets the standards set out in *Marshfield*.

Even assuming that *Marshfield* does not control, the sale of the Monument and the land satisfies the *Lemon* test. In *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Supreme Court adopted a three-part test for analyzing Establishment Clause cases. Although the *Lemon* test has been applied to constitu-tional challenges to the placement of a religious symbol on public property, it has not been applied in a challenge to a sale. Nevertheless, the *Lemon* standards are instructive in addressing the Appellees' claim of an Establishment Clause violation.

Under the *Lemon* test, a court considering whether a state action violates the Establishment Clause "must consider (1)

whether the government activity in question has a secular purpose, (2) whether the activity's primary effect advances or inhibits religion, and (3) whether the government activity fosters an excessive entanglement with religion." *Books*, 235 F.3d at 301 (citing *Lemon*, 403 U.S. at 612-13). "State action violates the Establishment Clause if it fails to satisfy any of these prongs." *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987).

The Appellees do not argue that the sale would "foster [ ] an excessive entanglement with religion." *Books*, 235 F.3d at 301. The City is, after all, *divesting* itself of a monument that the parties assume violated the Establishment Clause when it was on public ground. We focus our attention, therefore, on the first two prongs of the *Lemon* test—whether the sale had a secular purpose and whether the sale's primary effect was to advance or inhibit religion.

In determining whether a particular government action affecting a religious symbol has a secular purpose, a government's characterization of its purpose is entitled to deference. *Santa Fe Indep. Sch. Dist.*, 530 U.S. 290, 308. Courts, however, must ensure that the government's characterization is sincere. Initially, it is important to emphasize that in this case we are concerned with the purpose behind the sale of the Monument and not its purpose when originally installed. That being said, the purpose for which the Monument has remained in the Park for forty years is important in understanding why the City would choose to keep it where it was rather than allow it to be removed.

As this court explained in *Books*, there was a national effort to distribute as many as 5,000 monuments of the Ten Commandments throughout the country, many of them in cooperation with the Eagles. Whatever may have been the purpose of the City in accepting the Monument in 1964, from the time of its dedication in 1965 the Monument ap-

pears to have taken on a significant local meaning in the wake of the flood. This was not forgotten. In its resolution authorizing the sale, as well as the restriction in the deed recording the sale, the City reaffirmed the efforts of the youth volunteers during the 1965 flood. Unlike *Books*, however, where on the eve of litigation the city council first indicated that the monument in that case had a secular purpose, *see Books*, 235 F.3d at 304, the volunteer effort of La Crosse youth in protecting the City during the 1965 flood was expressly stated during the 1965 dedication as a reason for the gift of the Monument to the City by the Eagles.

The City also had a rather obvious secular motive for the sale—it wanted to eliminate its ownership in the Monument to preempt litigation accusing it of using the Monument to endorse a religious message by displaying it on public property. The Appellees claim that the reason is not secular because the City could have avoided the lawsuit by simply removing or allowing someone else to remove the Monument. They claim that by not removing it and by leaving it on what had been City property demonstrates that the City's motive was not secular. But as we have stated above, *Marshfield* makes clear that in most cases, a government can remedy a potential Establishment Clause violation by selling the real property where the religious monument sits. While removal was an option, so also was the sale. By selling the Monument site to end a perceived endorsement, the City exercised an option that served a secular purpose.

Finally, the sale of the property did not have the "*primary or principal* effect of advancing a religion." *Books*, 235 F.3d at 304 (emphasis added). In this prong, our focus is not on the intent of the City, but on whether a reasonable person, apprised of the circumstances surrounding the sale, would conclude that the sale amounted to an endorsement of religion. *Lynch*, 465 U.S. at 690; *Books*, 235 F.3d at 304; *Marshfield*,

203 F.3d at 493. A reasonable person, considering the history of the monument recited above, would understand the City's desire to keep the Monument in its original location. Moreover, the Eagles were the original donor, so they would be the logical purchaser. The sale allowed the Monument to remain intact across from the headquarters with easy access for continual maintenance of the parcel. Additionally, as discussed above, the location is nowhere near the seat of government, so there would be no unnatural carving out of a piece of property from what would otherwise obviously be the grounds of a city hall or courthouse. Given all these historic and secular reasons, no reasonable person would believe that this sale was to advance religion. All of this, when coupled with the authority established under *Marshfield* and the extensive efforts taken by the City to separate itself from any religious message the Monument might convey, would surely overcome any doubts a reasonable observer might have once he or she views the double fencing and multiple signs surrounding the Monument.

In addition to meeting the legal standards of the Establishment Clause, the sale achieves a practical goal. The City is able to extricate itself completely from the implied endorsement of the purpose and content of the religious symbol, yet the Monument can remain in the location it has occupied for many years. If the local citizens at some point want the symbol moved to make way for an alternate use, the solution can be found in the political rather than the legal process.

### III.

In the face of litigation threatening the presence of a monument of the Ten Commandments in a public park, the City of La Crosse decided to sell that Monument and a small parcel of land surrounding the Monument to the group that

had donated the Monument to the City forty years ago. This sale has clearly not pleased everyone, and it likely did not entirely please anyone. It was, however, constitutionally appropriate. The decision of the district court is reversed and the case is remanded so that the district court may enter an order of summary judgment in favor of the City and the Eagles.

REVERSED

BAUER, *Circuit Judge*. I respectfully dissent.

If one accepts the premise that, by its present action, the authorities of the City of La Crosse has effectively disassociated themselves and the City from an endorsement of religion by sponsoring a monument of The Ten Commandments, the majority opinion is hard to quarrel with. But I believe that the District Court had it right; the actions of the City actually show a stubborn refusal to separate itself from the display of a purely religious monument. Having created a problem by the original act of permitting a monument of The Ten Commandments to be displayed on public property with what any observer would have to conclude was an endorsement of the message of the commandments, the City elected a solution that I think borders on a fraud.

I am aware of the fact, set out carefully in the majority opinion, that a disclaimer has been set next to the monument which remains exactly where it was originally placed

on what was unquestionably public property, surrounded by public property, and for all intents and purposes is still public property. I am also aware that a transfer of a tiny share of the public domain to the Eagles was recorded and, if a passerby had the time and inclination, he or she could consult the official records of the Recorder of Deeds to verify this gesture. Moreover, as the majority opinion points out, a disclaimer sets out that the City is not endorsing anything. The disclaimer seems to me to be taken from a scene in the movie "The Wizard of Oz" in which the phony wizard, whose fraud has been exposed, directs the onlookers to "pay no attention to that man behind the curtain;" a disclaimer that is no more or less effective than the disclaimer at the monument. It too is an obvious sham.

The admonition of the Constitution that creates the separation of church and state forbids any government entity from endorsing, or seeming to endorse, religion but does not at all prevent individual members who make up a government entity from practicing or loudly announcing their deep religious convictions. They can place displays on their private property, put religious symbols on the bumper stickers of their cars, wear religious symbols on their clothing and even, by living up to the admonitions of the commandments in their personal and political lives show, by their example, their deep commitment to the religion of their choice. What they cannot do is, by word or action, spend public money endorsing or seeming to endorse on behalf of the government agency they represent, an endorsement of any religion. The monument belongs on what is obviously private property or a church setting. It does not belong where it is.

And, as I recall the story, when asked whether the law of God or the law of man was law to follow, the answer by the founder of Christianity was, "Render unto Caesar the things

that are Caesar's and to God the things that are God's."
Neither God nor religion requires an endorsement from
Government—nor does the law permit it.

I would affirm the finding and order of the district court.

A true Copy:

       Teste:

                          _____

                          *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*