**Roy J. CHAMBERS, Plaintiff,**

v.

**CITY OF FREDERICK,
et al., Defendants.**

**No. CIV. WDQ–03–1865.**

United States District Court,
D. Maryland,
Northern Division.

June 21, 2005.

Benjamin C. Block, David H. Remes, Irene J. Chase, Covington and Burling, Ayesha N. Khan, Washington, DC, for Plaintiff.

Michael Thomas Hamilton, Marks ONeill OBrien and Courtney PC, Baltimore, MD, Laurel Anne Albin, Warnken LLC, Attorneys at Law, Towson, MD, for Defendants.

## MEMORANDUM OPINION AND ORDER

QUARLES, District Judge.

In 1955, during the burst of marketing enthusiasm that accompanied the theatrical release of the movie "The Ten Commandments," Cecil B. Demille distributed some 5,500 stone copies of the commandments throughout the United States. Trial Tr. at 181. The city of Frederick, Maryland was the recipient of one of the copies. *Id.*[1]

---

1. The monument is made of granite, stands slightly less than five feet tall, and reads:
   the Ten Commandments
   I AM the LORD thy GOD.
   Thou shalt have no other gods before me.
   Thou shalt not make to thyself any graven images.
   Thou shalt not take the Name of the Lord thy God in vain.
   Remember the Sabbath day to keep it holy.
   Honor thy father and thy mother that thy days may be long upon the land which the Lord thy God giveth thee.
   Thou shalt not kill.
   Thou shalt not commit adultery.
   Thou shalt not steal.
   Thou shalt not bear false witness against thy neighbor.
   Thou shalt not covet thy neighbor's house.
   Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's.
   Jt. Stipulation of Facts at ¶ 1. Beneath the text of the commandments are engravings of two Stars of David and a Christogram comprised of the Greek letter Rho superimposed on the letter Chi. *Id.* At the top of the monument is an engraving of two tablets, an "Eye of Providence," and an eagle gripping the American flag. *Id.*

The monument is located on the Bentz Street Memorial Ground in Frederick, Maryland ("the Memorial Ground"). Jt. Stipulation of Facts at ¶ 1. The Memorial Ground, originally a graveyard of the Evangelical Reformed Church of Frederick ("Evangelical Church"), was conveyed to the City of Frederick ("Frederick") and Frederick County in 1924. *Id.* at ¶ 3. Pursuant to the deed of conveyance, Frederick and Frederick County were required to maintain the land as a memorial ground and to "preserve and maintain in a clean, orderly, dignified and reverential manner the land hereby conveyed." *Id.* The monument faces and is visible from Bentz Street, a main road for southbound traffic through downtown Frederick, and is about 23 feet away from the curb. *Id.* at ¶ 7.; Trial Tr. at 123; 137–39. Next to the commandments monument stands the "Names Memorial," a monument which lists the names of the persons buried in the Memorial Ground. Jt. Stipulation of Facts at ¶ 2. The two monuments are arranged in an arc several feet from the sidewalk, facing a park bench. *Id.* at ¶ 7.

After a relatively lengthy period of quiet acceptance of Demille's beneficence, the commandments monument became the focus of a suit by the American Civil Liberties Union ("the ACLU") in March 2002. *Id.* at ¶ 8. The ACLU argued that the monument's location in a public park violated the Establishment Clause. *Id.* In July 2002, the local Fraternal Order of Eagles ("FOE"), which had donated the monument to Frederick in 1958, learned of the controversy surrounding the monument's location and offered to purchase all or part of the Memorial Ground. Trial Tr. at 183–84.

On November 20, 2002, Frederick's Board of Aldermen, hoping to avoid litigation, voted to authorize the Mayor of Frederick to sell the monument and the parcel of land where it is located. *Id.* at 40–41, 168. The parcel to be sold measured 8,342 square feet and contains the "Names Memorial" as well as the commandments monument. Jt. Ex. 31 (Real Property Consultants appraisal report).

Frederick's Facilities Administrator, Pat Keegin, was charged with handling the bidding process and sale. Trial Tr. at 66–67. Although the Board of Aldermen had adopted a Resolution outlining procedures for selling City-owned property, Keegin mistakenly believed that the Resolution did not govern the sale of land in the Memorial Ground. *Id.* at 75. Keegin did not believe that Frederick was required to publicly advertise the parcel's sale because the size of the property was quite small. *Id.* at 109–110. The ACLU lawsuit brought significant attention to the monument's fate, however, thus several newspapers ran stories about Frederick's decision to sell the parcel. *Id.* at 84, 92.

By November 27, 2002, at least eight people or organizations had contacted Frederick to express interest in buying the parcel. *Id.* at 83. Each potential buyer received a letter from Keegin outlining the terms of the sale. *Id.* at 88. Frederick also sent unsolicited sales letters to at least eight local civic organizations, including the FOE. *Id.* at 85–87.

On December 3, 2002, the ACLU, satisfied that Frederick was selling the monument and the land beneath it, agreed to voluntarily dismiss its suit. Jt. Ex. 9 (dismissal agreement).

By mid-December 2002, Frederick had received four offers to purchase the property. *Id.* at 113.[2] In selecting a buyer,

---

**2.** Two of the offers came from organizations that had neither requested nor received bid packets. Trial Tr. at 113–114.

Keegin considered each bidder's ability to pay the appraised value of the property, willingness to abide by the covenants of the deed to the Memorial Ground, and ability to maintain the property. Jt. Ex. 26 (Keegin memo explaining selection criteria). Keegin was concerned that several of the bidders appeared unable to maintain the property. Trial Tr. at 114–16. One of the bidders, Herbert Schuck, was an older gentleman and it was unclear to Keegin whether his estate would be able to care for the property in the event of Schuck's death. *Id.* at 114–15. Another bidder, the Peroutka Foundation, was a relatively new organization and was not located in Frederick. *Id.* at 115–16. Keegin also questioned whether a third bidder, the Fredericktown Bank and Trust, involved in merger discussions with another bank, could be relied upon to maintain the site. *Id.* at 52. Because the FOE was the only bidder that could clearly comply with all of Keegin's selection criteria, he recommended to Frederick's Mayor that the parcel be sold to the FOE. *Id.* at 97. Frederick had no knowledge the FOE's plans for the monument, nor did it require that the monument remain located in the Memorial Ground. *Id.* at 54.

Frederick had prepared most of the deed of sale to the property prior to Keegin's selection of the winning bidder. *Id.* at 55–56. Thus, on December 23, 2002, the day Frederick decided to sell the parcel to the FOE, it executed the deed of sale. *Id.* at 55, 187. The FOE paid $6,700 for the parcel, its full appraised value. *Id.* at 188.[3] Since the sale, the FOE has been solely responsible for the maintenance of the par-

cel and the commandments monument. *Id.* at 49, 174.

On June 24, 2003, Roy Chambers, a resident of Frederick who lives within eight blocks of the commandments monument and comes into contact with it regularly, brought this suit alleging that Frederick's sale of the monument and the land on which it sits was a sham which failed to cure its Establishment Clause violation. Because Frederick and its Mayor acted under color of state law in selling the parcel, Chambers asserts that he is entitled to relief under 42 U.S.C. § 1983. The Court held a bench trial on January 18, 2005. The parties submitted proposed findings of fact and conclusions of law.

## ANALYSIS

■ The Establishment Clause states that "Congress shall make no law respecting an establishment of religion." U.S. CONST. amend. I.[4] The Establishment Clause "prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *County of Allegheny v. Amer. Civil Liberties Union,* 492 U.S. 573, 594, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (*quoting Lynch v. Donnelly,* 465 U.S. 668, 687, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring)).

The Court assumes, without deciding, that Frederick's longtime display of the commandments monument on city property violated the Establishment Clause. Chambers asserts that Frederick's sale of the monument and the land on which it sits

---

**3.** Frederick retained ownership of the "Names Memorial," although it is located on the parcel of land sold to the FOE, because it is obligated to maintain that monument by the deed of conveyance from the Evangelical Church: Trial Tr. at 36.

**4.** The Establishment Clause is made applicable to states and localities through the Fourteenth Amendment. *Everson v. Bd. of Educ. Of the Township of Ewing,* 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947)

failed to ameliorate its Establishment Clause violation because the transaction was a sham, designed to permit the ongoing display of the monument in its present location on the Memorial Ground, while circumventing the government action requirement of the Establishment Clause. Frederick counters that it dissociated itself from any message conveyed by the monument by selling it to the FOE.

■ "Absent unusual circumstances, a sale of real property is an effective way for a public body to end its inappropriate endorsement of religion." *Freedom From Religion Foundation, Inc. v. City of Marshfield*, 203 F.3d 487, 491 (7th Cir. 2000). Adherence to a formalistic standard, however, invites manipulation. *Id.* "To avoid such manipulation," the Court must "look to the substance of the transaction as well as its form to determine whether government action endorsing religion has actually ceased." *Id.*

■ Chambers argues that Frederick's sale of the monument to the FOE is suspect because Frederick failed to comply with its own procedural requirements for public land sales, and selected the FOE as the winning bidder although its bid was smaller than those of its competitors.

It is true that Frederick failed to comply with its guidelines for selling city-owned property when it sold the monument to the FOE, and the FOE bid less for the property than other bidders. There is no evidence, however, of "unusual circumstances surrounding the sale of the parcel of land so as to indicate an endorsement of religion." *Mercier v. Fraternal Order of Eagles*, 395 F.3d 693, 702 (7th Cir.2005). To the contrary, Frederick intended to conduct a valid sale in order to dissociate itself from the commandments monument. Keegin mistakenly believed that Frederick's land sale ordinance did not apply to the parcel of land that he was selling, and based on his many years of experience with the sales of city-owned property, attempted to conduct a valid sale by responding to public requests for bidding information, soliciting bids, and ultimately selling the property for its independently-appraised fair market value. *See id.* (property sold for fair market value passes constitutional muster, even if higher bids were tendered). Since the parcel was sold to the FOE, the FOE has been solely responsible for its upkeep. *Id.* (property sale constitutional, in part, because buyers assumed traditional duties of ownership).

Chambers argues that even if the sale was valid, it failed to end Frederick's Establishment Clause violation because the layout of the park would not inform a reasonable observer that the parcel containing the commandments monument is privately owned.

■ In *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court established a three-part test to determine whether government action constitutes an endorsement of religion. Government action does not violate the Establishment Clause if: (1) the action has a secular purpose; (2) the principal or primary effect of the action neither advances nor inhibits religion; and (3) the action does not foster excessive government entanglement with religion.

Although Frederick is not aware of any particular purpose in accepting and displaying the monument, contemporaneous accounts of the dedication ceremony indicate that the purposes were to remind citizens "not to bear false witness, to deal fairly and not to covet other's property," and to make the park into "a haven of tranquility." Trial Tr. at 19; Jt. Ex. 5 (*Eagles Courthouse Monument*, THE NEWS, June 30, 1953, at 22).

■ In determining whether government action affecting a religious symbol

has a secular purpose, a government's characterization of its purpose is entitled to deference, so long as the stated purpose is sincere. *Mercier,* 395 F.3d at 704 (*citing Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 308, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000)). As there is no evidence of religious purpose for Frederick's display, and no indication that its secular purpose was insincere, the Court finds that Frederick had a secular purpose in displaying the monument. This conclusion is bolstered by Frederick's decision to dissociate itself from the monument in response to accusations that it was endorsing a religious message. *See Mercier,* 395 F.3d at 705 ("[A] government can remedy a potential Establishment Clause violation by selling the real property where the religious monument sits.... By selling the monument site to end a perceived endorsement, the City exercised an option that served a secular purpose.").

■ Government action violates the effect prong if "irrespective of the government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Lynch,* 465 U.S. at 690, 104 S.Ct. 1355. When the Court finds that a reasonable person could perceive that a government action conveys a message that religion or a particular religious belief is favored or preferred, the Establishment Clause has been violated. *Freedom From Religion,* 203 F.3d at 493 (*citing Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 778–79, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (O'Connor, J., concurring)).

■ The reasonable person, in this context, is "similar to the 'reasonable person' in tort law, who 'is not to be identified with any ordinary individual, who might occasionally do unreasonable things,' but is

'rather a personification of a community ideal of reasonable behavior, determined by the [collective] social judgment.' " *Capitol Square,* 515 U.S. at 779–80, 115 S.Ct. 2440 (O'Connor, J., concurring) (*quoting* W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts 175 (5th ed.1984)). The reasonable observer is "deemed aware of the history and context of the community and forum in which the religious display appears." *Id.* at 780, 115 S.Ct. 2440.

■ It is true that a passerby may gather, based on the monument's location on the Memorial Ground, that Frederick endorses its message. But a reasonable observer, familiar with the history of the commandments monument, and the litigation surrounding its location, would understand that Frederick sold the property to the FOE to dissociate itself from whatever message the monument conveys. *See Mercier,* 395 F.3d at 705. A reasonable observer would also understand that the FOE, as the monument's original owner and the bidder best prepared to care for the parcel of land conveyed in the sale, was a logical purchaser for the property. *See id.* In light of these historic and secular considerations, and the FOE's freedom to remove the monument at any time, no reasonable observer would believe the continued display on the Memorial Ground was intended to advance religion. *See id.*[5]

### CONCLUSION

For the reasons discussed above, the Court finds Frederick's sale of the commandments monument and the land on which it sits, and its continued display on the Memorial Ground, constitutional.

---

**5.** The Court will not discuss whether the monument's location on the Memorial Ground causes excessive entanglement with a reli-

gious message because the parties have not addressed this issue.

## ORDER

For the reasons discussed in the accompanying Memorandum Opinion, it is, this 21st day of June 2005, ORDERED that:

1. judgment BE, and HEREBY IS, ENTERED for the Defendants and against the Plaintiff;

2. this case BE, and HEREBY IS, CLOSED; and

3. the Clerk of the Court shall send copies of this Memorandum Opinion and Order to counsel for the parties.